## ASSOCIATES DISCOUNT CORPORATION
## *v.* HILLARY ET UX.

[No. 292, September Term, 1970.]

*Decided June 25, 1971.*

*Motion for rehearing filed April 19, 1971; motion granted May 10, 1971 on certain questions and set for rehearing.*

The cause was argued on March 4, 1971, before BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ., and reargued on June 1, 1971, before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

Argued and reargued by *C. Edward Hartman, II*, with whom was *Stanley E. Hartman* on the brief, for appellant.

Argued by *James G. Perry* and reargued by *Melvin J. Sykes*, with whom was *James G. Perry* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The appellees, Theodore F. Hillary and his wife Dorothy Marie Hillary (Hillarys), on November 7, 1967, filed in the Circuit Court for Anne Arundel County a three count declaration charging trespass to realty, personalty and conspiracy to commit same against the appellant, Associates Discount Corporation (Associates). Also charged in the declaration individually and as agents, servants and/or employees of Associates were James Reese, William Osenberg, Charles C. Wanner and Arthur Frank Greenbaum, t/a Adjustments Services, Inc.

Near the end of the trial, the Hillarys pursuant to

Maryland Rule 541 moved to dismiss the declaration against all of the defendants except Associates. The trial court (Beardmore, J.) granted the Motion for Dismissal on the condition that it be with prejudice, "leaving in the case as sole defendant, Associates Discount Corporation."

Associates then promptly moved for its own dismissal on the theory that a voluntary dismissal with prejudice by the Hillarys of their tort claims against the agents and servants of Associates constitutes a release of Associates, their employer. Associates contends on appeal that the trial court committed reversible error in denying its Motion for Dismissal. The jury subsequently found for the Hillarys on all counts and awarded $19.91 compensatory damages and $15,000 punitive damages. A judgment was duly entered for $15,019.91 against Associates. After the denial by the trial judge of Associates' motion for judgment n.o.v., or in the alternative, for a new trial or a remittitur of the $15,000.00 punitive damages, the judgment became absolute. Associates thereafter filed a timely appeal.

Prior to the Hillarys' Motion for Dismissal, there had been a colloquy between the court and counsel on the question of admitting evidence of the defendants' financial worth for purposes of punitive damages. The court noted that the legislature in passing the Joint Tort-Feasors Act failed to provide for apportionment of damages. Recognizing the unfairness of the possible joint liability of the individual defendants for potentially great punitive damages based on the financial worth of the corporation, the court still indicated that it would allow evidence of the net worth of the defendants.

It was at this point that the Hillarys moved to dismiss the action against all defendants except Associates apparently theorizing that evidence of the financial worth of the more impecunious defendants would have a chilling effect upon possible punitive damages.

The facts giving rise to the action are basically undisputed. In February, 1965, Layton Braun, a friend of the

Hillarys, purchased an automobile under an installment contract. This installment contract, which provided for the acceleration of payments and repossession of the automobile in the event that payments were not made when due, was in turn purchased by Associates. After a series of missed payments and bad checks, Associates' office manager, Charles Wanner, instructed his outside adjusters, James Reese and William Osenberg, to repossess the Braun automobile if they could not bring the account to date. On the evening of August 28, 1967, Reese and Osenberg located the Braun automobile parked in the Hillary driveway. The Hillary car was parked directly behind the Braun car, thus making it impossible to take the Braun car without first moving the Hillary car. Reese and Osenberg asked the Hillarys to move their car so that they could take the Braun car. The Hillarys refused, saying that they had been loaned the use of the Braun car for the following day, that they knew nothing of the finance agreement and that they would not surrender the Braun car without the authorization of Layton Braun or confirmation by the State Police. It was already late at night so Reese and Osenberg called Wanner for further instructions. Wanner instructed them to turn the matter over to Arthur Greenbaum, trading as Adjustment Services, Inc., a repossessing service. Reese and Osenberg called Greenbaum, giving him the address and describing the car to be repossessed. Later that evening after the Hillarys were asleep, Greenbaum moved their car out onto the street and took the Braun car which he later turned over to Associates. In the process of moving the cars, Greenbaum damaged five azalea bushes valued at $19.90 and also made a tire mark on the lawn.

Charles C. Wanner, office manager of Associates since 1955, testified that Associates had written Braun a letter dated September 1, 1967—shortly after the repossession of the Braun car on August 28, 1967—which stated, *inter alia*, "Did you know that when *we* repossessed your car, your rights were not entirely extinguished?" (Emphasis supplied.) This letter was actually received by Braun, a

post office registered mail return receipt being in Associates' file. He admitted that Reese and Osenberg had reported to him that the Braun car was at the home of the Hillarys and was blocked in on their driveway. Reese and Osenberg generally stopped work around 7:30 to 8:00 p.m., so that Wanner "told them since they [the Hillarys] wouldn't give them the car for them to call Adjustment Services and. . .assign it to them who had people that were on the street at all times, or who would work during the night." In the morning one of the Hillarys called Wanner, told him that the Braun car had been "repossessed out of their driveway" and complained about their lawn being torn up and some azalea bushes being knocked down. Wanner told the one calling "to get in touch with Adjustment Services being as they were the people that repossessed the unit *for us*." (Emphasis supplied.) Wanner also stated that notwithstanding the notice given to him, he "still accepted the car from Adjustment Services and put it through the sale." Wanner also stated that because of the poor record payment of Braun and the frequent defaults in payment, it was "very urgent that this car be repossessed that particular night." Wanner testified also that Adjustment Services gave night service a "lot of times, not always." At the time he directed that Adjustment Services be called, he knew that the Hillarys had refused to move their own car so that the Braun car could be moved from the Hillary driveway and that the Braun car could not be driven or moved from the Hillary driveway without the Hillary car being moved.

Reese testified that Mrs. Hillary had stated that if a policeman came and told her to move the automobile, she would move it. He reported the situation to Wanner, who told him and Osenberg to call Adjustment Services and tell them to repossess the car.

Greenbaum in his deposition, part of which was read into evidence at the trial, stated that he always attempted to make a repossession on the date of receiving

an assignment. When he was given this assignment, he was given no "directions or warnings in regard to it."

The jury's award of $19.91 in compensatory damages included the $19.90 under the trespass to realty count and $.01 compensatory damages under the trespass to personalty count for the moving of the Hillary car by Greenbaum.

One of the Associates' arguments on appeal, as mentioned above, is that its only liability is that of an employer whose liability is derived from its employees. It contends that once its employees are released from personal liability, it also by the very nature of its liability is released.

The Hillarys, on the other hand, contend that the dismissal with prejudice is not a final adjudication and does not result in a release of Associates in any event. We do not find it necessary to decide these interesting questions, inasmuch as we have concluded that there was sufficient evidence in the case, with all reasonable inferences to be drawn from that evidence in favor of the Hillarys, to support the jury's verdict for compensatory damages of $19.91. We are of the opinion, however, that there was not sufficient evidence to permit the submission of an issue of punitive damages to the jury, so that the judgment including $15,000 punitive damages must be reversed.

Code (1969 Repl. Vol.) Art. 83, § 141 (a) provides:

"(a) *When seller may repossess.*—When the buyer is in default in the payment of any sum due under the installment agreement, or in the performance of any other condition which it lawfully requires him to perform in order to obtain title to the goods, or in performance of any promise the breach of which is, by the agreement, expressly made a ground for repossessing such goods, the holder may repossess the goods. Unless the goods can be repossessed without use of force, they shall be repossessed by legal pro-

cess. Nothing herein shall be construed to authorize a violation of the criminal law."

Although it is clear from the statute that Associates had the right to enter the Hillary property to repossess the Braun automobile, the statute does not authorize a violation of the criminal law.

The Code of Anne Arundel County (1967), Section 6-119 provides:

"Any person who shall enter upon the land or premises of any other person in the county, to the injury of such land and premises and against the wishes or notice of the owner thereof, shall be liable to a fine of not less than five dollars nor more than ten dollars for each offense to be collected as other fines, and nothing contained in this section shall repeal, modify or be in conflict with any existing law on the subject of trespassing."

There was evidence from which the jury could have found that entry was against the wishes or notice of the Hillarys and this was an illegal trespass.

The evidence we have already set forth and the reasonable inferences favorable to the Hillarys to be drawn from that evidence, although somewhat scanty, is sufficient, in our opinion, to warrant the submission of the case to the jury on the theory that Associates, Greenbaum, Reese and Osenberg were joint tort-feasors. The trial court did instruct the jury on this theory and we see no error in the instructions in this regard.

Wanner, as well as Reese and Osenberg, knew of the refusal of the Hillarys to permit the Braun car to be taken. They knew how the Braun car was blocked in by the Hillary car and that an unlawful trespass would likely occur if Greenbaum or his employees (Adjustment Services) were to enter, necessarily move the Hillary car and repossess the Braun car. Prior to the sale of the repossessed car, Wanner knew of damage to the Hillary

property and the moving of the Hillary car without permission, but nevertheless went forward with the sale and wrote Braun the letter of September 1, 1967, using the words, "We repossessed" the Braun car. The jury could infer that this was a ratification of the acts of Greenbaum and conclude that Associates, Greenbaum, Reese and Osenberg were joint tort-feasors. See 52 Am. Jur. *Trespassers*, § 31, page 861.

It appears to be conceded that Greenbaum was an independent contractor. This status alone, however, does not necessarily prevent Associates as his employer from liability.

As Judge (now Chief Judge) Hammond aptly stated for the Court in *Samson Co. v. Brusowankin*, 218 Md. 458, 464, 147 A. 2d 430 (1958) :

> "The cases make it plain that the mere employment of an independent contractor will not always relieve the principal from liability for damage done by the contractor. If the injury that occurs is such as might have been anticipated as a probable consequence of the execution of the work let out to the contractor under the instructions given by the employer, the employer, as well as the contractor, may be held liable. *P., B. & W. R. Co. v. Mitchell*, 107 Md. 600; *Bonaparte v. Wiseman*, 89 Md. 12. In *Levi v. Schwartz*, 201 Md. 575, 583, the trial court instructed the jury that if the contractor 'acted under the direction or with the consent of the officers or agents of the developer * * * then the developer and the officers or agents who gave authorization are liable' for the acts of the contractor, and this Court said: 'We think that instruction was correct.' We have no difficulty in concluding that what occurred as a result of the acts and omissions of Samson should have been foreseen by it and that the jury could find it responsible."

See 41 Am.Jur.2d *Independent Contractors,* § 34, page 794. See also § 44, page 811 where it is stated:

"As a general rule, where a trespass is committed upon the rights or property of another, by the defendant's advice or direction, the contractual or other relation, including that of an independent contractor, between the immediate agent of the wrong and the defendant, is immaterial in determining the defendant's liability. Where a trespass is committed by the advice and direction of the employer or contractee, or the work necessarily involves a trespass, the employer cannot justify the wrongful act by the plea that work was done by an independent contractor."

See also *South Carolina Natural Gas Co. v. Phillips,* 289 F. 2d 143 (4th Cir. 1961); *Anderson v. United States,* 259 F. Supp. 148 (E.D. Pa. 1966); *Lewis v. Phillips,* 223 Ark. 380, 266 S.W.2d 68 (1954); *Ketcham v. Newman,* 141 N. Y. 205, 36 N. E. 197 (1894); 21 A.L.R § 7 at 1261.

The entry of a dismissal with prejudice as to three joint tort-feasors, but not as to the fourth joint tort-feasor will not, in view of the provisions of the Uniform Contribution Among Tort-Feasors Act, Code (1968 Repl. Vol.), Art. 50, § 16, *et seq.,* discharge the fourth joint tort-feasor. Art. 50, § 18 provides that the recovery of a judgment of an injured person against one joint tort-feasor does not discharge the other joint tort-feasor and § 19 provides that a release by the injured person of one joint tort-feasor whether before or after judgment does not discharge the other tort-feasors unless the release so provides. These statutory provisions change the common law rule. See *Trieschman v. Eaton,* 224 Md. 111, 117-18, 166 A. 2d 892 (1961). Even if the dismissal with prejudice could be equated with a release of the three joint tort-feasors, there was obviously no intention to "re-

lease" Associates or to dismiss Associates with prejudice. The intention was to the contrary. Associates, therefore, was not released from liability as a joint tortfeasor and the award of the jury for $19.91 compensatory damages should be sustained.

We now turn to a consideration of the award of $15,-000.00 punitive damages.

In our opinion, the decision of our predecessors in *B. & O. R. R. Co. v. Boyd,* 63 Md. 325 (1885) is closely in point and decisive of the question in regard to punitive damages in the present case. In the *Boyd* case the plaintiff filed an action of trespass q.c.f. against the railroad company for entry upon her land, laying tracks and running trains over it. The trial court in that case permitted the case to go to the jury for allowance of punitive, as well as compensatory, damages. In reversing a judgment for the plaintiff, Judge Miller, for the Court, stated:

> "We are all of opinion the plaintiffs are not entitled to recover exemplary damages, and consequently that there was error in granting their second prayer, which allowed the jury to give such damages. This court has, on many occasions, had this subject before it, and in the very recent case of *R. R. Co. v. Hoeflich,* 62 Md. 300, 307, the question was very carefully considered, and we there said that 'to entitle one to such damages there must be an element of fraud or malice, or evil intent, or oppression, entering into and forming part of the wrongful act. It is in such cases as these that exemplary or punitive damages are awarded as a punishment for the evil motive or intent with which the act is done, and as an example or warning to others. But where the act, though wrongful in itself, is committed in the honest assertion of a supposed right, or in discharge of duty, or without any evil or bad intention, there is no ground on which such damages can be awarded.' This,

we are satisfied, places the doctrine upon the right ground, and the rule applies as well to cases of injury to property as to the person. A careful examination of the testimony in the record has convinced us that in the acts of the defendant in entering upon and building the tracks for their road over the plaintiffs' lot, and the continued use of them down to the bringing of the action, there is not a single one of the elements thus enumerated as essential to the allowance of such damages."

\* \* \*

"Counsel may have been mistaken in this view of the law, but there is nothing to show that he acted in bad faith, or that the company, in continuing to use the land under his advice, after the receipt of the letter from the plaintiffs' counsel, acted in a spirit of oppression, or from any evil motive or intent. Clearly this is not a case for punitive damages."

(63 Md. at 334-36.)

Chief Judge Hammond in *Damazo v. Wahby*, 259 Md. 627, 638-39, 270 A. 2d 814 (1970) aptly stated for the Court:

"The Maryland rule is that malice in the sense of deliberate and improper violation of a known right, that is, absence of legal justification, will support an action and permit recovery of compensatory damages for deprivation of known contractual rights but that actual malice must be shown to support punitive damages. *Knickerbocker Co. v. Gardiner Co.*, 107 Md. 556; *Stannard v. McCool*, 198 Md. 609; *Heinze v. Murphy*, 180 Md. 423. There is no evidence here to show more than that Damazo wanted to benefit himself by receiving the gross purchase price without diminution for commissions and the

various purchasers wanted to pay a lesser purchase price that the avoidance of the earned commissions would permit."

See also *St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.,* 262 Md. 192, 278 A. 2d 12 (1971).

The Hillarys argue that wanton conduct is sufficient to justify an award of punitive damages in the present case. See *Vancherie v. Siperly,* 243 Md. 366, 221 A. 2d 356 (1966) and *Nichols v. Meyer,* 139 Md. 450, 115 A. 786 (1921). They contend that there is evidence of wanton conduct in the entry upon the land of the Hillarys and drifting their car across the azaleas and onto the street. Assuming, *arguendo,* that wanton conduct would be equivalent to actual malice and sufficient for an award of punitive damages, in our opinion, there is no evidence of wanton conduct on the part of Associates, Greenbaum, Reese or Osenberg and, also, there is no evidence of any evil motive or intent on their part.

Greenbaum did not know the Hillarys personally and neither did Associates. There was no personal animosity or spite. The letter of September 1, 1967, from Associates to Braun shows that Associates had no animosity or ill will *toward him* and, indeed invited him to redeem the car or attend the proposed sale to bid and protect his interest. Greenbaum was entering upon the Hillary property to repossess the Braun car, not to injure the Hillarys. He was doing what he had done many times before in the course of his business. Associates, its employees and Greenbaum were seeking to advance a business purpose of their own, under a supposed claim of right; they were not seeking to injure the Hillarys or their property and, indeed, did very little actual damage to the Hillary property. There was no wanton or reckless disregard of the Hillary property rights. As *Boyd* clearly shows an ordinary trespass, in itself, and without the "spirit of oppression" or "evil motive or intent" does not justify an award of punitive damages. The trial court should have instructed the jury that there

was insufficient evidence in the case to justify an award of punitive damages.

The appellees also rely on two coal cases for the proposition that if the trespass and carrying away of the minerals are done with knowledge that the property belongs to another, punitive damages may be allowed, see *Barton Coal Co. v. Cox,* 39 Md. 1 (1873) or even if done through negligence, see *Atlantic Coal Co. v. Maryland Coal Co.,* 62 Md. 135 (1884). These cases are special cases in regard to mineral rights. See 1 *Harper & James Law of Torts,* § 1.8, page 28. Such cases frequently rest on special statutory provisions in regard to mineral rights. For the current Maryland Statute, see Code (1969 Repl. Vol.) Art. 75, § 41.

As we have indicated, the verdict for $19.91 compensatory damages is supportable by the evidence on the theory of recovery against Associates as a joint tortfeasor, but, inasmuch as such a verdict is below the jurisdictional amount of the Circuit Court for Anne Arundel County, we will reverse the entire judgment for $15,-019.91 and remand the case for an entry in the docket in the lower court that the verdict of the jury is sustained as to $19.91 only and that a judgment of *non pros* be entered pursuant to Maryland Rule 653.

> *Judgment reversed and the case remanded for an entry in the docket of the case in the Circuit Court for Anne Arundel County that the verdict of the jury is sustained as to $19.91 only and that a judgment of non pros be entered pursuant to Maryland Rule 653, the costs in this Court to be paid by the appellant, the costs in the lower court to be paid by the appellees.*