649 A.2d 1189

**ANNE ARUNDEL MEDICAL CENTER, INC.**

v.

**Nancy CONDON.**

**No. 278, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Dec. 1, 1994.

Luther Zeigler (Richard McMillan, Jr., Daniel Aronowitz and Crowell & Moring, Washington, DC, Roy B. Cowdrey, Jr. and Cowdrey, Thompson & Karsten, P.A., Easton, on the brief), for appellant.

Andrew H. Kahn (Kahn, Smith & Collins, P.A., on the brief), Baltimore, for appellee.

Daniel R. Lanier, Virginia A. Stuelpnagel and Miles & Stockbridge, Baltimore, for amicus curiae, Maryland Ass'n of Defense Trial Counsel.

John James Sellinger and Greenberg and Bederman, Silver Spring, for amicus curiae, Maryland Trial Lawyers' Ass'n.

Argued before MOYLAN, CATHELL and HARRELL, JJ.

MOYLAN, Judge.

This appeal and cross-appeal arise out of a medical malpractice action in which the appellee/cross-appellant, Nancy Condon (appellee), was misdiagnosed as *not* having breast cancer after a routine mammogram and subsequent biopsy were done. The appellant/cross-appellee, Anne Arundel Medical Center (AAMC or appellant), appeals from an order of the Circuit Court of Anne Arundel County denying its Second Motion for Summary Judgment. In support of its Second Motion for Summary Judgment, AAMC claimed that a settlement signed on the eve of trial releasing Dr. William A. Williams from liability also released AAMC from liability as a matter of law. This argument is premised on the fact that Dr. Williams was an agent of AAMC and that any liability attributed to AAMC was exclusively vicarious in nature.

As this Court agrees with the reasoning of the appellant, we reverse the order of the Circuit Court for Anne Arundel County denying appellant's Second Motion for Summary Judgment. Our disposition of the appeal on this ground renders the other three contentions of the appellant and the sole contention of the appellee/cross appellant moot.

On July 1, 1988, Nancy Condon underwent a routine mammogram ordered by her gynecologist, which revealed suspicious microcalcifications in her right breast. Advised by her doctor that her breast needed further examination, Ms. Condon selected Dr. Robert C. Moore to perform a biopsy of the breast tissue. The biopsy was ultimately performed on July 19 at the Anne Arundel Medical Center.

Ms. Condon knew that Dr. Moore was not a pathologist, and therefore, she did not expect him to perform the actual test on the breast tissue. Instead, the tissue was tested by Dr. William A. Williams, an independent contractor of the pathology corporation of William R. Weisburger, M.D., P.A. The pathology corporation, in turn, had an independent contract with AAMC to provide pathology services for hospital patients. The agreement between the pathology corporation and AAMC provided that all corporate pathologists who provide pathology services pursuant to the agreement "are not in any way considered employees of [AAMC]." AAMC's only role in the pathologist's interpretation was to provide necessary support services and equipment to enable the independent pathology corporation to interpret or to refer out pathology specimens.

Dr. Williams reported that the biopsy tissue was characterized by "fibrocystic change with sclerosing adenosis and microcalcifications with focal atypical intraductal hyperplasia." Based on this report, Dr. Moore advised Ms. Condon that she did not have cancer, but that she should undergo frequent mammograms.

On February 7, 1990, Nancy Condon consulted Dr. Moore complaining of an inflammation of her right breast in the same area of her previous biopsy. Dr. Moore again recommended

and performed a biopsy on February 15. Based on this second biopsy, Nancy Condon was advised that she was suffering from invasive carcinoma of the breast. On February 23, she underwent a bilateral modified radical mastectomy.

In the complaint filed with the Health Claims Arbitration Office (HCA), Ms. Condon alleged that the first biopsy specimen was incorrectly interpreted by Dr. Williams. She further alleged that Dr. Williams was acting as an employee, officer, or agent of the pathology corporation William R. Weisburger, M.D., P.A., and, at the same time, was also an employee, servant, or agent of AAMC. She also alleged that Dr. Williams' failure to interpret invasive carcinoma was a departure from reasonable and proper standards of medical care, and was the proximate cause of her injuries. The HCA panel ruled in favor of all three defendants.

Thereafter, Nancy Condon appealed the decision of the HCA panel by filing a complaint in the Circuit Court for Anne Arundel County, asserting the same causes of action against all three defendants. Once in the circuit court, both AAMC and the pathology corporation filed motions for summary judgment on the ground that neither entity was responsible for the conduct of Dr. Williams because he was an independent contractor of the pathology corporation with no direct or indirect relationship with AAMC. The trial court granted the pathology corporation's motion and dismissed it from the action. The trial court, however, denied AAMC's motion.

On the eve of trial, December 9, 1992, counsel for Dr. Williams offered to settle the claim against his client for $1,000,000.[1] Nancy Condon agreed to the settlement and signed a release with Dr. Williams' estate for $1,000,000. The

---

1. This was the full extent of Dr. Williams' liability insurance policy. Dr. Williams was deceased and his estate had been closed before Nancy Condon learned of his negligence and filed suit. Therefore, according to Maryland Estates and Trusts Code Ann., § 8–104 (1993), the $1,000,-000 payment represented the maximum award that could be obtained by anyone as a result of Dr. Williams' negligence.

execution of the release, therefore, dismissed all claims against Dr. Williams, the only active tortfeasor in the action.[2]

After the release was executed, AAMC immediately filed a Second Motion for Summary Judgment on the ground that its liability was solely vicarious in nature. AAMC claimed that its liability was only derivative and that since Dr. Williams had been released from liability, so too must AAMC be released as a matter of law. The circuit court denied AAMC's motion and the case against AAMC proceeded to trial.

After a trial on the merits, a special verdict sheet was given to the jury allowing for only one conclusion—whether AAMC was vicariously liable or not.[3] The jury returned the special verdict in favor of Nancy Condon and awarded damages in the amount of $3,061,719. After the special verdict was entered, AAMC filed three post-trial motions: 1) a Motion for Judg-

---

**2.** The intent of the release was stated to be as follows:

[It] is specifically intended only to release Releasee and is not intended in any way to affect any claim Nancy Condon has or may have against Anne Arundel Medical Center, Inc. and/or William A. Weisburger, M.D., P.A. or any other person, corporation, association, partnership, institution, unincorporated association, or other entity except to provide a credit *pro tanto* as to other tortfeasors in relation to the Plaintiff's claim as a whole.

**3.** The Special Verdict Sheet read as follows:

1. Do you find by a preponderance of the evidence that Nancy Condon's breast tissue biopsy on July 19, 1988 was diagnosed by an apparent agent of Anne Arundel Medical Center? _X_ YES ___NO (If your answer to Question No. 1 is yes, proceed to Question No. 2. If your answer to Question No. 1 is no, do not answer any other question.)

2. Do you find by a preponderance of the evidence that the above mentioned care rendered to Nancy Condon was negligent? _X_ YES ___NO (If your answers to Question Nos. 1 & 2 are yes, proceed to Question No. 3. If your answers to Question Nos. 1 & 2 are no, do not answer any other question.)

3. If your answer to Question No. 2 is yes, did such negligence proximately cause harm or loss to Plaintiff, Nancy Condon? _X_ YES ___NO (Question No. 4 simply listed the amount of damages awarded. Since damages are not relevant to the issue which constitutes the basis of our decision, Question No. 4 was intentionally excluded.)

ment Notwithstanding the Verdict on the ground that the release of Dr. Williams extinguished appellee's claims against AAMC; 2) a Motion for a New Trial on the ground that the appellee's damages were excessive; and 3) a Motion to Reduce the Judgment by the Credit for the appellee's settlement with Dr. Williams and by the amount the verdict for non-economic damages exceeded the $350,000 statutory cap.

The trial court denied AAMC's motions for judgment notwithstanding the verdict and for a new trial, but granted the request to reduce the award. The court reduced the amount of non-economic damages from $1.8 million to $350,000, and also deducted $1 million from the total verdict which represented the consideration for the settlement and release with Dr. Williams' estate. After the court's reduction, the award stood at $611,719.

■ The appellant is appealing on the ground that an agent and his principal, whose liability is solely vicarious, are not joint tortfeasors under Maryland's version of the Uniform Contribution Among Tort-feasors Act (UCATA). Md.Code Ann., art. 50 §§ 16–24. The appellant claims that the common law rule, which states that the release of an agent discharges the principal from liability, should, therefore, apply. We agree.

■ At common law, an individual injured by the negligence of more than one tortfeasor could proceed against any one for payment of damages recovered. Payment by one tortfeasor, however, would not only act as satisfaction to the injured individual, but would release all other tortfeasors liable for the injury. *Swigert v. Welk,* 213 Md. 613, 619, 133 A.2d 428, 431 (1957); *Gunther v. Lee,* 45 Md. 60, 66–67 (1876); *Mamalis v. Atlas Van Lines, Inc.,* 522 Pa. 214, 560 A.2d 1380 (1989) *citing Hilbert v. Roth,* 395 Pa. 270, 149 A.2d 648 (1959). The purpose of such a rule was two-fold. First, in the eyes of the law, although there might have been two tortfeasors, there was but one cause of action. Therefore, a release to one of two tortfeasors who acted in concert necessarily released the other. Second, courts were afraid of promoting double recov-

eries by plaintiffs. W. Prosser & W. Keeton, *Prosser & Keeton on The Law of Torts*, § 49, at 332–33 (5th ed. 1984).

■ In 1941, however, the Maryland Legislature adopted its own version of UCATA. That new law, regulating the treatment of joint tortfeasors in Maryland, abrogated the common law rule by enabling an individual to settle with one joint tortfeasor and still have recourse against the remaining tortfeasors.

Md.Ann.Code art. 50, § 19, titled "Effect of release on injured person's claim," states that "[a] release by the injured person of one joint tortfeasor, whether before of after judgment, does not discharge the other tort-feasors unless the release so provides; but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release...." Section 21, moreover, provides that any right of indemnity under existing law is not impaired. In effect, the Act provided for the first time for a right of contribution among joint tortfeasors. *Cf. Theophelis v. Lansing General Hosp.*, 430 Mich. 473, 424 N.W.2d 478, 482 (1988).

■ In order for the Act to apply to the case at hand, however, Dr. Williams and AAMC must be shown to be joint tortfeasors. No Maryland court has yet squarely addressed the issue of whether an agent and his principal, whose liability is solely vicarious, are joint tortfeasors under Maryland's version of UCATA. Several other jurisdictions, however, have had opportunities to consider this issue. The courts that have confronted the issue have fallen on both sides of the proverbial fence; either they hold that their respective versions of UCATA include vicariously liable defendants so that a principal is not released by the release of the agent, *See, e.g., Van Cleave v. Gamboni Construction Co.*, 101 Nev. 524, 706 P.2d 845 (Nev.1985), or they hold that their versions of UCATA do not include vicariously liable defendants so that the principal is released when the agent is released. *See, e.g., Elias v. Unisys Corp.*, 410 Mass. 479, 573 N.E.2d 946 (1991); *Theophelis v. Lansing General Hosp.*, 430 Mich. 473, 424 N.W.2d 478 (1988);

*Mamalis v. Atlas Van Lines, Inc.,* 522 Pa. 214, 560 A.2d 1380 (1989).

We are persuaded that the better reasoned approach is to hold that Maryland's version of UCATA does not include vicariously liable defendants and, therefore, that an agent and his principal are not joint-tortfeasors under Md.Ann.Code art. 50, §§ 16–24. Thus, when liability of the principal is solely vicarious in nature and is not based upon the principal's independent actionable fault, a release of the agent acts as a release of the principal as a matter of law. In the present case, once it became a fact that AAMC was only vicariously liable, the release of Dr. Williams precluded further recovery against AAMC.

Md.Ann.Code art. 50, § 16(a) defines "joint tort-feasors" as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." The appellee argues, and the trial court in denying AAMC's Second Motion for Summary Judgment agreed, that that definition brings Maryland's version of UCATA into play whenever a person is jointly or severally liable in tort, regardless of the modality of liability. For this Court to uphold the trial court, however, we would have to ignore the basic and significant distinctions between vicarious and joint liability. *Elias v. Unisys Corp.,* 410 Mass. 479, 573 N.E.2d 946, 948 (1991).

Vicarious Liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another.

More bluntly stated, "[i]n hard fact, the reason for the employer's liability is the damages are taken from a deep pocket." The principal, having committed no tortious act, is not a "tortfeasor" as the term is commonly defined. Ac-

cording to Black's Law Dictionary (5th ed.), a tortfeasor is "a wrong-doer; one who commits or is guilty of a tort." (citations omitted).

*Theophelis v. Lansing General Hosp.,* 430 Mich. 473, 424 N.W.2d 478, 482–83 (1988).

■ Joint liability, by way of contrast, is based on the concept that all joint (or concurrent) tortfeasors are actually independently at fault for their own wrongful acts. It is because of their independent wrongdoing that under Md.Ann. Code art. 50, § 19, a plaintiff is permitted to bring an action against one joint tortfeasor after having released another joint tortfeasor from liability. *Elias,* 573 N.E.2d at 947. Each tortfeasor faces liability for his or her own wrongdoing.

In support of its contention that Maryland's version of UCATA, indeed, applies even to defendants who are only vicariously liable, the appellee relies primarily on the Court of Appeals' decision in *Chilcote v. Von Der Ahe Van Lines,* 300 Md. 106, 476 A.2d 204 (1984). In *Chilcote,* the Court of Appeals stated that the definition of "joint tort-feasors" under Md.Ann.Code art. 50, § 16(a) "is broad enough to include a person liable solely by reason of *respondeat superior.* We agree that Van Lines falls within the § 16(a) definition." 300 Md. at 113, 476 A.2d 204. That statement, taken out of context, appears to support the appellee's position. The statement, however, is passing *dicta* not supported by the Court's ultimate holding.

*Chilcote* was a negligence action arising from a three-vehicle collision. The first vehicle was owned and operated by Carmen Chilcote, husband of the plaintiff, Gloria Chilcote. The second vehicle was owned by Von Der Ahe Van Lines (Master), but was driven by a Van Lines servant (Servant). The third vehicle was driven by Amos Webb, Jr. (Webb). Chilcote sued both Servant and Webb directly for their own negligence and sued the Servant's Master under the theory of *respondeat superior.* Before trial, defendant Webb settled with Chilcote and received a release in which Chilcote agreed that her right to recover damages from Servant and Master was thereby

"reduced to the extent of the *pro rata* share of [Webb] of the damages of the [Plaintiffs] recoverable against [Master and Servant] should [Webb] be found jointly liable with them." 300 Md. at 109. When the case went to trial, the jury found that both Servant and Webb were negligent and that their joint negligence proximately caused the accident.

The issue addressed on the appeal was whether Webb's *pro rata* share of the damages was one-half or one-third. In holding that Webb's *pro rata* share was one-half, the court stated that

[T]he history of the 1939 Model Act [The Uniform Contribution Among Tort–Feasors Act, promulgated by the National Conference of Commissioners on Uniform State Laws from which the Maryland "UCATA" law, with some modification, was taken], court decisions, particularly those applying the Md. Act or the 1939 Model Act, the opinions of commentators and the ramifications of indemnification of a master by a servant, which § 21 of the Md. Act preserves, persuades us that, *where the liability of the master is vicarious, master and servant comprise but one "pro rata share."* (emphasis added).

*Id.* at 114, 476 A.2d 204. The court held the master and servant to be a single and indivisible unit with respect to liability.

The *Chilcote* Court also cited with approval, 300 Md. at 115–16, 476 A.2d 204, the comments of Professor Charles O. Gregory, Reporter to the National Conference for the 1939 Model Act, explaining the nature of the master's and servant's liabilities in cases of wrongdoing solely by the servant.

[S]uppose a case arises in which P is injured by the concurrent negligence of A and S, the latter being a servant of M acting within the scope of his employment. Even if it appears that M was at home asleep when the accident occurred, he is still fully liable to P for the damage caused and hence could be called a "tortfeasor." In many states P

could join A, S, and M as codefendants and recover a joint and several judgment against them.

*   *   *   *   *   *

Although M is a tortfeasor for many purposes due to his vicarious liability and S is undoubtedly a tortfeasor because of his conduct, they should obviously be treated as a single tortfeasor for the purpose of distributing the loss by contribution. *Actually the two of them present a single unit of responsibility.* Whatever M has to pay in discharge of his liability to P, he may usually shift this entire loss to S in an action for indemnity . . . Substantially, then, it appears that *as between M and S, the latter is the one who is at fault and M is not a tortfeasor at all.* (emphasis added).

*Gregory, Contribution Among Tortfeasors: A Uniform Practice,* 1938 Wis.L.Rev. 365, 375–76 (1938).

The holding in *Chilcote* was clear. If Van Lines had been considered a joint tortfeasor, then it necessarily would have been assessed one-third of the liability, separate from its agent, rather than being considered a single entity in combination with its agent.

The appellee further claims that the Court of Appeals "directly addressed" this issue in the case of *Associates Discount Corp. v. Hillary,* 262 Md. 570, 278 A.2d 592 (1971). In *Associates,* the Hillarys sued Associates Discount Corporation (Associates) alleging that Associates was liable for damages to the Hillarys' property caused when an independent contractor hired by Associates repossessed a car that was being kept on the property. The Hillarys also sued Associates's independent contractor, Greenbaum; an employee of Associates, Wanner; and two outside adjusters for Associates, Osenberg and Reese. Before the conclusion of the trial, the Hillarys dismissed all defendants except Associates in order to increase the possibility of recovering punitive damages. Associates moved to dismiss, arguing that the dismissed parties were its agents and, therefore, the voluntary dismissal of its agents constituted a release of Associates as principal. The motion

was dismissed and the jury returned a verdict in favor of the Hillarys for compensatory and punitive damages.

On Appeal, the Court stated that:

One of the Associates' arguments on appeal ... is that its only liability is that of an employer whose liability is derived from its employees. It contends that once its employees are released from personal liability, it also by the very nature of its liability is released.

The Hillarys, on the other hand, contend that the dismissal with prejudice is not a final adjudication and does not result in a release of Associates in any event. *We do not find it necessary to decide these interesting questions, inasmuch as we have concluded that there was sufficient evidence in the case, with all reasonable inferences to be drawn from that evidence in favor of the Hillarys, to support the jury's verdict for compensatory damages of $19.91.* (emphasis added).

262 Md. at 576, 278 A.2d 592. The Court expressly found sufficient evidence that the principal had ratified the tortious acts of its agents and was thus independently liable. All of the defendants in *Associates,* therefore, were active tortfeasors. Such a holding clearly makes *Associates* inapposite to the issue now on the table.

The case of *Mamalis v. Atlas Van Lines, Inc.,* 522 Pa. 214, 560 A.2d 1380, 1382 (1989), from the Pennsylvania Supreme Court, is particularly instructive. Pennsylvania adopted the 1939 version of the Model Act containing the same definition of "joint tort-feasor" as does Maryland's § 16(a). *See* 42 Pa. Cons.Stat.Ann. § 8322. *Mamalis*'s approach in resolving the issue presented in this case is especially persuasive because in *Chilcote* the Court of Appeals looked to Pennsylvania law for guidance in resolving issues of joint tortfeasor and vicarious liability under Maryland's version of UCATA. *See Chilcote v. Von Der Ahe Van Lines,* 300 Md. 106, 118–19, 476 A.2d 204 (1984) citing and quoting from, with approval, *Jones v. Harrisburg Polyclinic Hospital,* 496 Pa. 465, 437 A.2d 1134 (1981)

(master and servant are one share of liability in computing *pro rata* shares under 1939 Model Act).

In *Mamalis,* the Pennsylvania Supreme Court was faced with the same issue presented in our case, "whether an agent and its principal are joint tortfeasors under the Uniform Contribution Among Tort-feasors Act" when the liability of the principal is vicarious and is not based upon the principal's independent actionable fault. *Id.* 560 A.2d at 1381. In holding that a vicariously liable principal is *not* a joint tortfeasor under UCATA, the Pennsylvania Supreme Court quoted the lower court's opinion with respect to the distinction between the concept of liability vicariously imposed by law and the purpose behind UCATA.

> The system of contribution among joint tortfeasors, of which the Uniform Act's apportionment rules are a key component, has arisen completely apart from the system of vicarious liability and indemnity and meets an entirely distinct problem: how to compensate an injury inflicted by the acts of more than one tortfeasor. Unlike the liability of a principal, the liability of a joint tortfeasor is direct (because the tortfeasor actually contributed to the plaintiff's injury) and divisible (since the conduct of at least one other also contributed to the injury).

*Mamalis,* at 1383, *quoting Mamalis v. Atlas Van Lines, Inc.,* 364 Pa.Super. 360, 365–66, 528 A.2d 198, 200–01 (1987). The Pennsylvania Supreme Court concluded that, unless the plaintiff could demonstrate affirmative independent wrongdoing on the part of the principal, termination of the claim against the agent extinguishes the derivative claim against the principal. 560 A.2d at 1383. We agree with that rationale. Absent independent wrongdoing by the principal, the release of an agent will also release the principal as a matter of law.

Our holding is also, we think, logically compelling. The release of an agent removes the only basis for imputing liability to the principal. *Theophelis v. Lansing General Hosp.,* 430 Mich. 473, 424 N.W.2d 478, 486 (1988). To hold otherwise would undermine the stated purpose underlying

UCATA of promoting settlements among joint tortfeasors. *See Lahocki v. Contee Sand & Gravel Co.*, 41 Md.App. 579, 620, 398 A.2d 490, 513 (1979), *rev'd on other grounds sub nom. General Motors Corp. v. Lahocki*, 286 Md. 714, 410 A.2d 1039 (1980). It is unlikely that an agent would ever settle with a plaintiff if he still remained liable to indemnify his principal for any further amount the principal might be compelled to pay to the plaintiff. The reluctance of an agent to settle in such an event would be consistent with Md.Ann.Code art. 50, § 21, which states that this section "does not impair any right of indemnity" under Maryland's version of UCATA. *See Elias v. Unisys Corp.*, 410 Mass. 479, 573 N.E.2d 946, 948 (1991); *Mamalis v. Atlas Van Lines, Inc.*, 522 Pa. 214, 560 A.2d 1380, 1382 (1989); *But see Van Cleave v. Gamboni Construction Co.*, 101 Nev. 524, 706 P.2d 845 (1985) ("As to any subsequent action by the employer against the employee, '[a] primary wrongdoer enters [settlement] agreements at the peril of being later held to respond again in an indemnification action brought against him by the vicarious wrongdoer.'")

If a plaintiff, under such a hypothetical legal scheme, were able to find an agent willing to settle, to allow the plaintiff then to proceed additionally against a vicariously liable principal would, in essence, permit the plaintiff "two bites out of the apple." If the principal could then seek indemnity from the agent, the agent's earlier settlement would be of little solace to him. Such a double exposure would act as a disincentive for agents ever to agree to a settlement.

*JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.*