Rafael Jacinto CONVIT & Washington Brain & Spine Institute, P.C., Appellants/Cross–Appellees,

v.

Eileen WILSON, Appellee/Cross– Appellant.

Nos. 07–CV–585, 07–CV–646, 07–CV–671.

District of Columbia Court of Appeals.

Argued Nov. 6, 2008.
Decided Sept. 17, 2009.

1106

Alfred F. Belcuore, Washington, and Andrew H. Baida, with whom Steven A. Hamilton and Matthew D. Banks were on the brief, for appellants/cross-appellees.

Bruce J. Klores, Washington, with whom Thomas W. Mitchell was on the brief, for appellee/cross-appellant.

Before REID, GLICKMAN, and THOMPSON, Associate Judges.

REID, Associate Judge:

This is a medical malpractice action in which Eileen and Frederick Wilson, husband and wife, filed a two-count complaint against Dr. John Barrett, and against appellants/cross-appellees, Washington Brain & Spine Institute, P.C. ("WBSI") (Dr. Bar-

rett's employer) and Dr. Rafael Jacinto Convit. Mr. Wilson alleged that Dr. Barrett and Dr. Convit's negligent treatment and care caused him to suffer severe and permanent neurologic injuries.[1] Mrs. Wilson claimed loss of consortium. Prior to trial, Mrs. Wilson entered into a settlement agreement (only with Dr. Barrett) regarding the loss of consortium claim; she released Dr. Barrett from the lawsuit, without prejudice, in exchange for $4,050,000.00. WBSI and Dr. Convit declined to settle and proceeded to trial. The jury found them jointly and severally liable and awarded Mr. Wilson $20,109,000.00 on his negligence claim (Count I) and Mrs. Wilson $2,500,000.00 for her loss of consortium claim (Count II).

WBSI and Dr. Convit filed post-verdict motions for judgment as a matter of law, or in the alternative, for a new trial. The trial court denied the motions on all grounds, with the exception of WBSI's and Dr. Convit's request that the jury verdict be reduced as a result of the settlement agreement signed by Mrs. Wilson and Dr. Barrett. As to the judgment relating to the loss of consortium claim and the $2,5000.000.00 award of damages, the trial court determined that WBSI was entitled to a *pro tanto* credit and Dr. Convit a *pro rata* credit, and that the $1,550,000.00 in excess funds from Mrs. Wilson's $4,050,000.00 settlement with Dr. Barrett should be applied to WBSI's joint and several liability of $20,109,000.00 on the negligence claim, thus reducing its liability to $18,559,000.00. Dr. Convit remained jointly and severally liable for the $20,109,000.00 negligence damages award.

On appeal, WBSI argues that the trial court erred when it determined that Mrs.

Wilson's settlement with Dr. Barrett did not extinguish both the negligence and loss of consortium claims against WBSI, the vicariously liable employer. Dr. Convit contends, in part, that Mrs. Wilson produced insufficient evidence to prevail on the negligence claim against him, because "Dr. Barrett's failure to remove the shunt when Mr. Wilson was hospitalized the day after Dr. Convit's surgery constituted a superseding cause that relieved Dr. Convit of any liability." Both WBSI and Dr. Convit generally argue, in the alternative, that if this court rejects their primary arguments, the court should hold that in light of Dr. Barrett's settlement, the trial court erred by failing to grant them a 50% *pro rata* credit and reduction of the total amount of the jury's verdict as to both counts of the complaint. Mrs. Wilson cross-appeals on the ground that the trial court erred in calculating the settlement credits due WBSI and Dr. Convit.

We reverse the trial court's reduction of WBSI's liability for the award of damages on Mr. Wilson's negligence claim, but we affirm its judgment in all other respects.

## FACTUAL SUMMARY

The record shows that the events leading to Dr. Barrett's settlement and the jury verdict in this case began in early 1999 when Mr. Wilson began experiencing memory loss and gait problems. Dr. Mohammed Moussavian, a neurologist at Kaiser Permanente ("Kaiser"), referred him to Dr. Barrett, a neurosurgeon, and on December 2, 1999, Mr. and Mrs. Wilson met with Dr. Barrett. Dr. Barrett determined that Mr. Wilson was suffering from obstructive hydrocephalus[2] due to compression and obstruction in the aqueduct of

---

1. On January 21, 2005, the trial court appointed Mrs. Wilson guardian *ad litem* for her husband for purpose of making decisions concerning the settlement and/or prosecution of his negligence claim.

2. Obstructive hydrocephalus is "a form of hydrocephalus in which the cerebrospinal fluid accumulates in the ventricles of the brain, because the outlet for the fluid is blocked."

Sylvius;[3] Dr. Barrett recommended that Mr. Wilson allow him to place a ventriculoperitoneal ("VP") shunt[4] into Mr. Wilson's right ventricle to clear the obstruction.[5] Mr. Wilson agreed to the procedure.

Dr. Barrett performed the operation at the Washington Hospital Center on December 8, 1999. To insert the VP shunt, Dr. Barrett cut a hole in the bone of Mr. Wilson's skull that was about the size of a dime; cut through the dura (a thick lining underneath the bone); placed a ventricular catheter (part of the plastic tubing) through the brain into the right ventricle; and threaded the peritoneal end of the catheter underneath the skin down to Mr. Wilson's abdomen.[6]

During a second surgical procedure on December 11, 1999, necessitated because the initial tubing proved to be too short, Dr. Barrett inserted a longer catheter because "as the spinal fluid was draining down into the peritoneum, the ventricles became smaller [retracted] ... and the

[existing] catheter was lodged in the brain[;] it did not quite reach the ventricle." With two or three non-absorbable nylon sutures, Dr. Barrett anchored the reservoir to Mr. Wilson's head, closed the galea layer (the layer of skin under the scalp) with absorbable zero vicryl sutures, and stapled the skin closed.

At a follow-up appointment on February 22, 2000, Mrs. Wilson alerted Dr. Barrett to a little red scab that had formed over the posterior aspect of the incision. Dr. Barrett pushed on the wound to check for pain, tenderness, or other indications of an infection. He found none. Dr. Barrett told Mrs. Wilson that the scab would heal and recommended that Mr. Wilson put neomycin ointment, a triple antibiotic, on his head three times a day. Mr. Wilson followed Dr. Barrett's instructions; the scab eventually fell off. When Mr. and Mrs. Wilson returned to Dr. Barrett's office on April 18, Dr. Barrett noticed that the wound under the scab had dehiscence;[7] the size of the wound was about a

*Schmidt's Attorney's Dictionary of Medicine and Word Finder* Vol. 2 H–132 (1992).

3. The aqueduct of Sylvius is "an elongated canal in the midbrain which connects the third ventricle with the fourth ventricle. The ventricles are normal cavities within the brain." *Id.* at Vol. 1 A–342.

4. Ventriculoperitoneal shunt is "[t]he surgical creation of a communication between a cerebral ... ventricle ... and the peritoneal cavity ... by means of a plastic tube, to provide drainage of cerebrospinal fluid (from the ventricle to the peritoneal cavity), for the relief of hydrocephalus." *Id.* at Vol. 4 V–67. Dr. Michael Williams, the neurology director of the adult hydrocephalus program at Johns Hopkins University who treated Mr. Wilson beginning in June 2000, testified that there are three basic pieces to a shunt: (1) the ventricular catheter (tube) which goes into the ventricles; (2) a valve, designed to open and close, depending on the pressure of the spinal fluid; and (3) the other end of the catheter (or distant catheter) that comes down under the skin under the chest wall through an incision

in the abdominal wall so that the other end of the catheter is inside the abdominal (peritoneal) cavity.

5. Dr. Williams testified that a benign tumor that had developed in Mr. Wilson's brain most likely caused the obstruction.

6. In addition to Dr. Williams' testimony, the parts of the shunt were described at trial by Dr. Sidney John Peerless, a retired neurosurgeon and witness for the plaintiffs. He stated that the shunt has different parts-tubing with a wire that is inserted into the cavity of the brain through a hole in the skull and cut to the proper length; this part of the tubing is attached to another part of the tubing known as the "reservoir valve and pump," which opens in response to pressure and which usually is put under the skin, down the back of the head, neck, chest and into the peritoneal cavity in the abdomen.

7. Dehiscence means "[t]he act or process of splitting open, as of a partially healed laceration or incision." *Schmidt's Attorney's Dictio-*

quarter of an inch long. He could see the edge of the VP shunt reservoir.

Dr. Barrett wanted Mr. Wilson to consult with a plastic surgeon to discuss covering over the wound; and he contacted Dr. Moussavian on April 27. He "asked Dr. Moussavian to arrange a plastic surgery consultation." He did not request that Dr. Moussavian have the plastic surgeon proceed with an operation to cover the open wound.

On May 10, 2000, Dr. Convit received a referral marked urgent from Dr. Moussavian stating that Dr. Barrett wanted Dr. Convit to perform a flap procedure on Mr. Wilson's exposed VP shunt. Two days later, Dr. Convit met with Mr. and Mrs. Wilson at his office in the Washington Hospital Center. Mrs. Wilson told Dr. Convit that Mr. Wilson "had the shunt in [his head]; that the opening wouldn't close, and it had been open for five months." Based on his examination of the wound, Dr. Convit believed it showed no clinical signs of infection and that he could safely cover the wound by performing a flap procedure.[8] However, before performing the flap procedure, Dr. Convit sent Mr. Wilson back to Kaiser for a pre-operative evaluation, which included a complete blood count, and a surgery clearance. Mr. Wilson's white blood count showed no signs of a hidden infection; Kaiser cleared Mr. Wilson for the flap procedure on May 17.

On May 18, Dr. Convit still found no clinical signs of infection. He took pictures of the wound and then performed the flap procedure. During the course of the surgery, Dr. Convit "debrided the tissue around the shunt ... and then mobilized the tissues to cover it." He also found

some permanent sutures that he removed; they were embedded in the scar tissue around the exposed reservoir of the shunt. Sometime later that day, Dr. Convit released Mr. Wilson from his care.

The next morning, May 19, Mr. Wilson suffered a generalized seizure. He was taken to Calvert Memorial Hospital, and later, to the Washington Hospital Center. Upon his arrival at the Washington Hospital Center, Mr. Wilson was "severely comatose, unable to respond." Doctors placed an emergency shunt into Mr. Wilson's left ventricle to relieve pressure from his brain because the right shunt was blocked. A few days after the procedure, Mrs. Wilson saw Dr. Barrett who told her that Mr. Wilson's condition was caused by the flap procedure; he believed that during the procedure, "Dr. Convit kinked the tubing in behind the ear[.]" But, Dr. Barrett reassured her that he could "straighten that out" by placing "another shunt in on the [left] side and connect[ing] it to the ... one [on the right side]."

On May 25, Dr. Barrett replaced the emergency shunt with a permanent left VP shunt. He left the nonoperational right shunt in because he did not find any signs of infection in the multiple cerebral spinal fluid samples drawn from the left lateral ventricle and he wanted to avoid the risk of removing the right shunt. On May 28, doctors performed a lumber puncture which showed abnormality in Mr. Wilson's white blood cell count. On May 29, doctors tested spinal fluid from the right shunt; it showed evidence of yeast called candida, and staph epidermidis, a bacteria. On May 29, Dr. Edward Aulisi removed the right and left shunts.

---

*nary of Medicine and Word Finder* Vol. 1 D–30.

**8.** Dr. Convit testified that there was no evidence of infection based on his observation

that Mr. Wilson had no pain or sensitivity in the area around the wound; the color was a normal pinkish color of healing; and there was no pus or purulence coming out of the wound.

Upset by the treatment doctors provided Mr. Wilson at the Washington Hospital Center, Mrs. Wilson had him transferred to Johns Hopkins Hospital on June 26. From that point forward, Dr. Williams took over as Mr. Wilson's neurosurgeon. Mr. Wilson remained at Johns Hopkins for about five and a half weeks. He did not regain consciousness while there. Due to her inability to pay for her husband's medical care, Mrs. Wilson took him home and cared for him herself. Mr. Wilson eventually regained consciousness but remained bed ridden suffering from neurological problems.[9]

Mr. and Mrs. Wilson filed their complaint on May 16, 2003. There were efforts along the way to settle the lawsuit for the limits of each defendant's insurance policy, totalling approximately $10,000,000.00. WBSI and Dr. Convit declined to settle, but on April 25, 2006, Mrs. Wilson and Dr. Barrett (and the attorneys for both) executed a settlement agreement (the "Agreement" or "the settlement agreement") for $4,050,000.00. In the Agreement the parties acknowledged that Mrs. Wilson's "Claim for loss of consortium is significant, and could easily be valued at $5,000,000.00 by the jury." The Agreement stated: "it is agreed by the parties that they have reached a partial settlement only, and only as to those claims that are part of Eileen's Claim against Dr. Barrett"; the Agreement "in no way release[s] the defendant [WBSI] from any part of [Mr. Wilson's] Claims against WBSI for Barrett's actions ..." Although the Agreement provided that Mrs. Wilson would "not refile an action against Dr. Barrett for her own claim," Mrs. Wilson and Dr. Barrett "stipulate[d] and agree[d] that th[e] Agreement [was] not a release in any respect of Dr. Bar-

rett's liability to the plaintiff [Mrs. Wilson] for [Mr. Wilson's] claim." The parties also agreed that "[s]ince the period of limitations has expired, Dr. Barrett ... waives any ... form of time bar recognized in the law in a subsequent action by the plaintiff against Dr. Barrett for damages for [Mr. Wilson's] claim, for a period of eighteen months from the date of this agreement." On April 25, 2006, the trial court granted Dr. Barrett's oral motion to be dismissed from the lawsuit "without prejudice" in light of the Agreement he entered into with Mr. and Mrs. Wilson.

WBSI immediately moved for summary judgment, claiming that because the Agreement released Dr. Barrett from the lawsuit, it also released WBSI, the vicariously liable party. The trial court denied WBSI's motion for summary judgment as to both the negligence and loss of consortium claims.[10]

After a jury trial, beginning on April 26, 2006 and extending to May 22, 2006, during which the parties presented numerous fact and expert witnesses, the jury found WBSI and Dr. Convit jointly and severally liable on both the negligence and loss of consortium claims and awarded damages to Mr. Wilson in the amount of $20,109,000.00 and $2,500,000.00 to Mrs. Wilson. Dr. Convit and WBSI filed postverdict motions for judgment as a matter of law or, in the alternative, for a new trial. In a seventeen-page written order, the trial court denied their motions, indicating generally that "[t]he liability issues were presented to the jury on conflicting expert testimony, and the resulting verdicts were not against the great weight of the evidence." Specifically, as it did before trial, the court rejected WBSI's contention that "the settlement of Mrs. Wilson's loss of

---

**9.** In her brief, Mrs. Wilson notified the court that Mr. Wilson died on October 22, 2007.

**10.** The trial court thought the release of WBSI with regard to the loss of consortium claim presented the more difficult issue.

consortium claim with Dr. Barrett, by operation of law, discharged not only the liability of WBSI to her on the loss of consortium claim, but its liability to Mr. Wilson as well." After reviewing the "litigation environment" and "context" at the time of the settlement, and the intent of the Wilsons and Dr. Barrett, the court determined that the parties to the agreement "deliberately structured their settlement in such a way as to preserve Plaintiffs' cause of action against both WBSI and Dr. Convit to the full extent possible beyond the one claim that was settled." Recognizing "these unusual facts" surrounding the settlement, noting the absence of applicable case law in this jurisdiction, and relying in part on case law from other jurisdictions and Restatements of the Law, the court declared that "the settlement of Mrs. Wilson's loss of consortium claim with Dr. Barrett probably did not release even that claim against WBSI, and almost certainly it did not release or discharge the liability of WBSI on Mr. Wilson's personal injury claim, even though the liability of WBSI, *vel non,* was solely vicarious."

The trial court, however, agreed with Dr. Convit and WBSI that under the case law in this jurisdiction they, as "non-settling tortfeasors[,] are entitled to a credit against [the jury] verdict based on a settlement between the plaintiff and another party" due to Dr. Barrett's settlement agreement with Mr. and Mrs. Wilson. The court reasoned that the settlement by its agent, Dr. Barrett, entitled WBSI "to a dollar for dollar *pro tanto* credit against Mrs. Wilson's verdict on the consortium claim," and that "Dr. Barrett's settlement effectively resolved all of the liability of

Dr. Barrett and the vicarious liability of WBSI on that claim." Dr. Barrett's settlement entitled "Dr. Convit, as a separate joint tortfeasor, ... to a 50% *pro rata* credit toward Mrs. Wilson's verdict on the consortium claim, which reduces the verdict against him on that claim from $2.5 million to $1.25 million."

With regard to the $1,550,000.00 in excess of the jury award that Dr. Barrett paid on Mrs. Wilson's loss of consortium claim, the trial court was aware of case law in this jurisdiction permitting plaintiff to retain the excess,[11] but the court decided, instead, to reduce "Mr. Wilson's verdict against WBSI ... by $1,550,000.00, [while determining that] Dr. Convit [should] remain[ ] jointly and severally liable for the full amount." The trial court explained its decision as follows:

> Here ..., where the settlement amount far exceeds the verdict [on the loss of consortium claim], the liability of WBSI is vicarious only, and the settling Defendant and WBSI are considered a single tortfeasor for credit purposes, it seems fair that WBSI, rather than Plaintiffs, should receive the benefit of the "extra" money paid by Dr. Barrett. Even with the *pro tanto* credit to WBSI on the consortium claim, Mrs. Wilson still receives much more on that claim, between the settlement amount and the amount for which Dr. Convit remains liable after application of the *pro rata* credit, than the jury determined it to be worth [$5.3 million compared with the jury verdict of $2.5 million].... This result seems especially appropriate in the circumstances of this case, given the dynamics that drove the settlement, the understanding of all parties that the

---

11. The trial court asserted:

A plaintiff often makes a favorable settlement with one of two joint tortfeasors, which ends up netting the plaintiff, after application of a *pro rata* credit to the non-settling tortfeasor, more than the jury de-

clared the claim to be worth. The one-satisfaction rule ordinarily does not deprive the plaintiff of the "windfall." *See Berg* [v. *Footer*], 673 A.2d [1244,] 1256–57 [D.C. 1996].

money paid by Dr. Barrett represented a desire on his part to settle the claims of both Plaintiffs against him, and the practical reality that the settlement proceeds will undoubtedly benefit the family unit, including, of course, Mr. Wilson. In the absence of any authority to the contrary, this result strikes the court as the most reasonable way to allocate the settlement funds in the unusual circumstances of this case.

In support of its rationale, the trial court cited *District of Columbia v. Washington Hosp. Ctr.,* 722 A.2d 332, 336 (D.C.1998) (en banc).

Furthermore, the trial court addressed other contentions made by the defendants, which also had been advanced during trial. Both WBSI and Dr. Convit argued that Mrs. Wilson failed to establish that they "violated any applicable standard of care or that any such violation caused the injury suffered by Mr. Wilson." The trial court found that Mrs. Wilson's "experts were all well qualified to offer expert opinion testimony, they were all familiar with the pertinent national standards of care, and they all offered testimony, which the jury was free to accept or reject, that the respective doctors violated the standard of care and caused the injury of Mr. Wilson." With respect to the issue of causation, the trial court noted that "[t]he medical causation questions were extremely complex"; and "[e]ven if the opinions on when and where the infection started and the related causation issues tended to favor Defendants, Plaintiffs definitely had enough on their side to submit the issues to the jury and, in the court's opinion, the resulting verdict was not against the great weight of the evidence." As to WBSI's and Dr. Convit's argument that they were entitled to a new trial because the damages awarded were excessive, the trial court pointed to Mr. Wilson's need for "millions of dollars of medical and nursing care" due to the "devastating neurological injury, which has left him conscious but bedridden for the past six years and will leave him bedridden for the rest of his life." Moreover, the court "[could] not say that the verdict was impermissibly based on bias, prejudice, passion or consideration of any other improper factors."

## ANALYSIS

### The Settlement Agreement

WBSI argues that the trial court erred by failing to release it from suit after Mrs. Wilson and Dr. Barrett entered into their settlement agreement because "[t]he legal consequence of the Wilson–Barrett resolution was to extinguish all the Wilson claims against WBSI." WBSI claims that the common law unitary discharge rule commands its release; under that rule, the release of the agent, Dr. Barrett, from liability automatically releases the principal, WBSI, where the principal's liability is solely vicarious. Moreover, WBSI contends, "[a]lthough the dismissal was assertedly 'without prejudice,' it was nonetheless tantamount to dismissal 'with prejudice,' a final resolution of the Wilson claims against Dr. Barrett, because his dismissal ... occurred after the statute of limitations on all those claims had expired." And, Mrs. Wilson's loss of consortium claim should also be dismissed WBSI asserts, because "the settlement agreement expressly contained her commitment to forego any claim against Dr. Barrett[,]" a commitment that "operated in law to extinguish her claim against WBSI."

Mrs. Wilson argues that "[t]here is nothing in the Agreement that expressly constitutes a release, or even implies that Mr. or Mrs. Wilson intended to release [Dr. Barrett]." According to Mrs. Wilson, a "dismissal [of Dr. Barrett] from the case 'without prejudice' was not a release." "[T]he effect of a 'without prejudice' dismissal is simply to excuse a defendant

from the case"; "[i]t has no prejudicial impact on claims that a plaintiff might re-file against the dismissed defendant. Nor can it affect the plaintiff's existing claims against other defendants in the pending suit." Mrs. Wilson also contends that her settlement with Dr. Barrett did not exonerate WBSI of all liability because this court has never considered whether the unitary discharge rule applies in the agent-principal context and that the rule "should be rejected because it is incompatible with several District of Columbia policies, principles, and precedents."

 We begin with the legal principles that will guide our analysis. "Vicarious liability ... is merely a legal concept used to transfer liability from an agent to a principal[,]"[12] and includes the theory of respondeat superior as developed in agency law.[13] Under that theory, the responsibility of an agent for his own legally careless action is imputed to the principal.[14] Thus, we have said that "in cases involving derivative liability under the doctrine of respondeat superior, the master's liability is limited to that of the servant, the only active tortfeasor...."[15]

In determining whether the release of one joint tortfeasor releases all, this juris-diction historically followed the common law rule (advocated here by WBSI) that "a release of one joint tortfeasor operated as a release of all joint tortfeasors."[16] That common law rule was "abandoned" in 1943, however, when the D.C. Circuit held that " 'partial satisfaction taken in compromise and release of liability of one or some of the wrongdoers does not discharge the others.' "[17] We reaffirmed that holding in 1982 and 1987, emphasizing that:

> [T]he effect of a release of a joint tort-feasor was ordinarily a question of fact dependent on two inquiries: (1) did the plaintiff intend to release all wrongdoers or only the particular party named in the release; and (2) did the amount settled for fully compensate the plaintiff or was it taken merely as the best obtainable compromise for the settler's liability.... Only where the terms of the release "leave no room for doubt" should these decisions be made as a matter of law.[18]

Furthermore, we reiterated our "adhere[nce] to the doctrine that releases are contracts and should be construed according to established rules of contract interpretation."[19] In that regard, we look to

---

**12.** *Agomo v. Fenty*, 916 A.2d 181, 192 (D.C. 2007) (citation omitted).

**13.** *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 29 (D.C.1979).

**14.** *President and Dirs. of Georgetown Coll. v. Hughes*, 76 U.S.App. D.C. 123, 125, 130 F.2d 810, 812 (1942). We have used different terms interchangeably to describe the agency relationship that exists under the doctrine of respondeat superior, "including principal-agent, master-servant, and employer-employee." *Judah v. Reiner*, 744 A.2d 1037, 1040 n. 5 (D.C.2000). The terms are indistinguishable for purposes of this opinion.

**15.** *Estate of Underwood v. National Credit Union Admin.*, 665 A.2d 621, 648 n. 41 (D.C. 1995) (citations omitted); *see also* RESTATE-

MENT (THIRD) OF AGENCY § 7.03 cmt. b (2006) ("a principal's vicarious liability turns on whether the agent is liable.").

**16.** *Noonan v. Williams*, 686 A.2d 237, 240 (D.C.1996) (citation omitted).

**17.** *Id.* (quoting *McKenna v. Austin*, 77 U.S.App. D.C. 228, 234, 134 F.2d 659, 665 (1943)).

**18.** *Noonan, supra* note 16, 686 A.2d at 240–41 (quoting *Hill v. McDonald*, 442 A.2d 133, 138–39 (D.C.1982); *Lamphier v. Washington Hosp. Ctr.*, 524 A.2d 729, 735 (D.C.1987)).

**19.** *Noonan, supra* note 16, 686 at 241 (citing *Lamphier, supra* note 18, 524 A.2d at 732). (other citations omitted).

"the parties' intentions as paramount" in interpreting the release,[20] and our review is *de novo*.[21] After considering our own case law and the law and legal principles followed in other jurisdictions concerning releases (including the "flat bar" rule, the specific identity or specific designation rule, and the intent rule), we concluded that our case law, beginning with *McKenna, supra* note 17, combined aspects of the "flat bar rule"[22] and the "intent rule";[23] consequently, we first "look at the language of the release and see if it unambiguously reflects the parties' intent to confer a benefit on [a party], thereby releasing him from any potential liability."[24] Second, if necessary, we turn to "extrinsic evidence of the parties' subjective intent."[25]

While we no longer follow the common law rule with respect to the impact of a release of one joint tortfeasor on other joint tortfeasors, we have never held whether, under vicarious liability, the release of an agent releases the principal. However, in 1982 *dicta*, we suggested that the release of the agent would relieve the principal of liability.[26] We are called upon here to decide the difficult question of whether the settlement agreement between Mrs. Wilson and Dr. Barrett released both Dr. Barrett and WBSI from liability as to all the Wilson claims, as WBSI argues, or at least with respect to Mrs. Wilson's loss of consortium claim. Specifically, we must decide whether we should hold generally that a release of an agent also releases the principal from liability, or whether, like the trial judge, we should extend our earlier decision abandoning the common law rule relating to joint tortfeasor releases to the unique circumstances of this case, by holding that the release or discharge of Dr. Barrett from Mrs. Wilson's loss of consortium claim did not effect a release of the vicariously liable principal (WBSI) on either the negligence or the loss of consortium claim. We briefly focus on how other jurisdictions have handled the question of releases in the vicarious liability context. Between the late nineteenth and mid-twentieth century, a majority of courts adopted the common law rule that a valid release of an agent for tortious conduct releases the principal when the plaintiff's claim is based on vicarious liability.[27] The rationale articulated by the majority rested on different theories,[28] but the driving force behind the common law rule appeared to be that in

**20.** *Noonan, supra* note 16, 686 A.2d at 241 (citing *Lamphier, supra* note 18, 524 A.2d at 732) (other citations omitted); *see also Caglioti v. District Hosp. Partners, Lp*, 933 A.2d 800, 808 (D.C.2007).

**21.** *Noonan, supra* note 16, 686 A.2d at 244–45 (citation omitted).

**22.** Under the "flat bar rule," "as a matter of law [ ] a general release is unambiguous and therefore provides for the discharge of *all* potential joint tortfeasors, both named and unnamed." *Id.* at 241 (footnote omitted).

**23.** The intent rule permits use of "extrinsic evidence" to determine the intent of the parties "if the terms of the release are not clear on the face of the document itself." *Id.* at 244.

**24.** *Id.* (citations omitted).

**25.** *Id.* at 245.

**26.** In *Hill, supra* note 18, we said: "Certainly, as a matter of logic, it is hard to see how a *principal* could still be held liable after the release of its *agent*, the only real wrongdoer. But the converse is not at all obvious." 442 A.2d at 138 n. 5.

**27.** *See generally*, Annotation, *Release of (covenant not to sue) master of principal as affecting liability of servant or agent for tort, or vice versa*, 92 A.L.R.2d 533 § 4 (1963).

**28.** *Id.*

the absence of the rule a plaintiff could receive more than one satisfaction for her injury.[29] A growing number of courts, however, have since abrogated the common law rule, holding that the modern rule pertaining to joint tortfeasors—the release of one joint tortfeasor does not release all others unless the release so intended—is equally applicable in the vicarious liability context.[30]

Courts which have extended the modern rule to vicarious liability have decided that the plain language of the Uniform Contribution Among Tortfeasors Act (UCATA),[31] or a substantially similar state statute pertaining to the release of joint tortfeasors, encompasses vicariously liable parties.[32]

**29.** *See, e.g., Max v. Spaeth,* 349 S.W.2d 1, 3 (Mo.1961); *McClure v. Lence,* 349 Ill.App. 341, 110 N.E.2d 695, 696 (1953); *Geib v. Slater,* 320 Mich. 316, 31 N.W.2d 65, 67–68 (Mich.1948); *Brown v. Cambridge,* 85 Mass. 474, 476 (1862).

**30.** *See, e.g., JFK Medical Ctr., Inc. v. Price,* 647 So.2d 833, 834 (Fla.1994) (settlement agreement which voluntarily dismissed physician (employee) from lawsuit did not bar continued litigation against medical center (employer)); *Yates v. New South Pizza, Ltd.,* 330 N.C. 790, 412 S.E.2d 666, 667–68 (1992) (employer (principal) was not discharged from liability where plaintiff executed a covenant not to sue employee (agent) but reserved the right to sue employer); *McFadden v. Turner,* 159 N.J.Super. 360, 388 A.2d 244, 247 (1978) (employer hospital released but not employees where under an "intent/full satisfaction test" "defendant employees were not … intended to be released and … the settlement amount was not intended to and did not, in fact, constitute full compensation for the claim").

**31.** The Conference of Commissioners on Uniform State Laws promulgated the UCATA in 1939, and revised it in 1955. Some states have adopted the 1939 version while others have adopted the 1955 version. Section 4 of the 1939 version of the UCATA provides:

> Release; Effect on Injured Person's Claim.—A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides; but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

1939 UCATA § 4, 12 U.L.A. 57–58 (1975). Section 1 of the 1939 version defines joint tortfeasors as follows:

> for the purposes of this Act the term "joint tortfeasors" means two or more persons

jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them.

1939 UCATA § 1, 12 U.L.A. 57 (1975). Section 4 of the 1955 version provides:

> When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
> (a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide[.]

1955 UCATA § 4, 12 U.L.A. 98 (1975). The 1955 version does not define the term "joint tortfeasor." The District has not adopted either version of the UCATA; instead the common law rule pertaining to joint tortfeasors has evolved through case law. *See Noonan, Lamphier, McKenna, supra* notes 16, 17, 18.

**32.** *See Hermes Automation Tech., Inc. v. Hyundai Elecs. Indus. Co., Ltd.,* 915 F.2d 739 (1st Cir.1990); *Woodrum v. Johnson,* 210 W.Va. 762, 559 S.E.2d 908 (2001); *Glidewell v. S.C. Mgmt. Inc.,* 923 S.W.2d 940 (Mo.Ct. App.1996); *Saranillio v. Silva,* 78 Hawai'i 1, 889 P.2d 685 (1995); *Harris v. Miller,* 335 N.C. 379, 438 S.E.2d 731 (1994); *Brady v. Prairie Material Sales, Inc.,* 190 Ill.App.3d 571, 137 Ill.Dec. 857, 546 N.E.2d 802 (1989); *Krukiewicz v. Draper,* 725 P.2d 1349 (Utah 1986); *Thurston Metals & Supply Co., Inc., v. Taylor,* 230 Va. 475, 339 S.E.2d 538 (1986); *Van Cleave v. Gamboni Constr. Co.,* 101 Nev. 524, 706 P.2d 845 (1985); *Alaska Airlines, Inc. v. Sweat,* 568 P.2d 916 (Alaska 1977); *Holve v. Draper,* 95 Idaho 193, 505 P.2d 1265 (1973); V. Woerner, Annotation, *Release of (or covenant not to sue) master or principal as affecting liability of servant or agent for tort, or vice versa,* 92 A.L.R.2d 533 (2009 Supp.); Vitauts M. Gulbis, Annotation, *Release of, or Covenant not to Sue, One Primarily Liable for Tort, but Expressly Reserving Rights Against*

They generally reason that "both the master and the servant are 'persons liable in tort for the same injury,'" and "'tortfeasors as used in [the UCATA] refers to those persons liable in tort.'"[33] Courts which have adopted this modern view through case law have adhered to a similar rationale and at least a few have explicitly stated that "[a]lthough the liability of the master and the servant is joint and several, the same principles apply to them in an action based solely on the negligence of the servant as would apply in actions against joint tort-feasors."[34] Some of those courts have also emphasized giving effect to the intentions of the parties executing the release.[35]

Courts that have retained the common law rule have emphasized that abrogating the common law rule would require them to ignore the basic "distinctions between vicarious and joint liability."[36] As the Maryland Court of Special Appeals articulated in *Condon, supra* note 36:

Vicarious Liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another.

More bluntly stated, "in hard fact, the reason for the employer's liability is the damages are taken from a deep pocket." The principal, having committed no tortious act, is not a "tortfeasor" as the term is commonly defined. According to Black's Law Dictionary (5th ed.), a tortfeasor is "a wrong-doer; one who commits or is guilty of a tort." (citations omitted).

Joint liability, by way of contrast, is based on the concept that all joint (or concurrent) tortfeasors are actually independently at fault for their own wrongful acts. It is because of their independent wrongdoing that under Md. Ann.Code art. 50, § 19, a plaintiff is permitted to bring an action against one joint tortfeasor after having released another joint tortfeasor from liability. Each tortfeasor faces liability for his or her own wrongdoing.[37]

*One Secondarily Liability, as Bar to Recovery Against Latter,* 24 A.L.R.4th 547 (1983).

**33.** *Yates, supra* note 30, 412 S.E.2d at 669; *see also Saranillio, supra* note 32, 889 P.2d at 699; *Krukiewicz, supra* note 32, 725 P.2d at 1351–52; *Alaska Airlines, supra* note 32, 568 P.2d at 929–30.

**34.** *Miller v. Grand Union Co.,* 270 Ga. 537, 512 S.E.2d 887, 888 (1999) (citation and internal quotation marks omitted); *see also Pelo v. Franklin Coll., of Indiana,* 715 N.E.2d 365 (Ind.1999); *Cartel Capital Corp. v. Fireco of New Jersey,* 81 N.J. 548, 410 A.2d 674 (1980); *Knutson v. Morton Foods, Inc.,* 603 S.W.2d 805 (Tex.1980); *Plath v. Justus,* 28 N.Y.2d 16, 319 N.Y.S.2d 433, 268 N.E.2d 117 (1971).

**35.** *See Pelo, supra* note 34, 715 N.E.2d at 366; *Knutson, supra* note 34, 603 S.W.2d at 807; *Plath, supra* note 34, 268 N.E.2d at 120.

**36.** *Anne Arundel Med. Ctr. v. Condon,* 102 Md.App. 408, 649 A.2d 1189, 1193 (1994) (citing *Elias v. Unisys Corp.,* 410 Mass. 479, 573 N.E.2d 946, 948 (1991)); *see also In re Williams v. Vandeberg,* 620 N.W.2d 187 (S.D. 2000); *Alvarez v. New Haven Register, Inc.,* 249 Conn. 709, 735 A.2d 306 (1999); *Mamalis v. Atlas Van Lines Inc.,* 522 Pa. 214, 560 A.2d 1380 (1989); *Atkinson v. Wichita Clinic, P.A.,* 243 Kan. 705, 763 P.2d 1085 (1988); *Theophelis v. Lansing Gen. Hosp.,* 430 Mich. 473, 424 N.W.2d 478 (1988); *Horejsi v. Anderson,* 353 N.W.2d 316 (N.D.1984).

**37.** *Condon, supra* note 36, 649 A.2d at 1193 (quoting *Theophelis, supra* note 36, 424 N.W.2d at 482–83) (internal citation omitted).

The Maryland intermediate appellate court believes that the common law rule is "logically compelling" because "[t]he release of an agent removes the only basis for imputing liability to the principal."[38]

In contrast to the Maryland approach as articulated in *Condon*, the Appellate Division of the New Jersey Superior Court has extended the modern joint tortfeasor release rule to vicarious liability; and in doing so, that court has focused on the intent of the parties and the impact of the settlement agreement on satisfaction of plaintiff's claim:

> The general rule in this jurisdiction is that a release of one tortfeasor will not release others who may also be liable to plaintiff for his harm unless the release is so intended or the plaintiff receives as a result thereof either full satisfaction or satisfaction intended as such. *Breen v. Peck*, 28 N.J. 351, 146 A.2d 665 (1958).... [W]e see no reason why the rule should not apply as well to the single act of negligence for which both the actual wrongdoer and his master or

principal are each independently liable. The rationale of the rule is equally apposite whether the liability is actual or vicarious—namely, that plaintiff is entitled to pursue all those who are independently liable to him for his harm until one full satisfaction is obtained.[39]

In 1980, the New Jersey Supreme Court agreed with the Appellate Division's analysis in *McFadden*, *supra* note 30, stating in part:

> Even when liability of one defendant is wholly vicarious, settlement with the primarily liable defendant may not necessarily release the other.... [T]he legal effect of a release on other parties should be determined by the intent of the parties to the release, with due consideration being given to whether the compensation paid was fully adequate. That eminently more just rule has been consistently followed.[40]

The New York Court of Appeals has taken a similar approach by examining the intent of the parties:

**38.** *Condon*, *supra* note 36, 649 A.2d at 1196 (citing *Theophelis*, *supra* note 36, 424 N.W.2d at 486).

**39.** *McFadden*, *supra* note 30, 388 A.2d at 246–47. The Florida Supreme Court in *JFK Medical Ctr., Inc.*, *supra* note 30, looked to the RESTATEMENT (SECOND) OF JUDGMENTS (1982) to support its conclusion that plaintiff's release of a physician did not relieve the employer medical center of liability; as the court said:

> Pursuant to the Restatement ..., section 51(4) A judgment by consent for or against [an] injured person does not extinguish his claim against the person not sued in the first action....
> The comments to subsection (4) state:
> f. *Judgment by consent* ... The settlement of a claim against one of several obligors generally does not result in the discharge of others liable for the obligation. This rule applies when the obligation is reduced to judgment, see § 50, and even though the liability of one obligor is deriva-

tive from another under principles of vicarious responsibility. Moreover, a judgment by consent, though it terminates the claim to which it refers, is not an actual adjudication. See § 27, Comment e. The considerations that lead to denying issue preclusive effect to consent judgments, chiefly the encouragement of settlements, are applicable when an injured person has claims against more than one person for the same wrongful act. It is therefore appropriate to regard the claim against the primary obligor and the person vicariously responsible for his conduct as separate claims when one of them has been settled. Any payment received by the injured person in such a settlement ... discharges pro tanto the obligation of the other obligor to pay the loss.
> 647 So.2d at 834 n. 1.

**40.** *Cartel*, *supra* note 34, 410 A.2d at 680 (citations omitted); *see also Sweeney v. Sweeney*, 405 N.J.Super. 586, 966 A.2d 54, 60 (2009).

Where a release has been given but the releasor reserves the right to proceed against other wrongdoers, we believe effect should be given to the intent of the parties as expressed by these reservations and allow suit against any defendant not a party to the release.[41]

Of course WBSI insists that the trial court "erred in refusing to apply Maryland law to extinguish Mrs. Wilson's consortium claim"; WBSI also contends that the decision in *Condon* "squarely controls" this case. Mrs. Wilson voices strong opposition to WBSI's position, asserting that under *Lamphier, supra* note 18, "District of Columbia law controls because the [settlement a]greement was negotiated and executed in the District of Columbia, and related to litigation in the Superior Court of the District of Columbia"; and further, that the *Condon* decision "has little persuasive value here because it is an inter-mediate appellate court decision, not a pronouncement of Maryland's highest court."

The trial court spent substantial time on the settlement agreement issues prior to trial in this case, on April 21, 24, and 25, 2006. Its analysis and rulings are consistent with the extension of the modern rule (on releases in the joint liability context) to vicarious liability. The trial court also looked to considerations which we highlighted in *Noonan, supra* note 16, in interpreting settlement agreements and releases according to contract principles—the intent of the parties, and the extent to which the settlement amount fully compensated the plaintiffs.

■ In informing the parties of his ruling, the trial judge noted the trend away from the common law toward the modern rule with respect to the effect of a release on a non-settling joint tortfeasor. He then examined case law, including *Condon, Plath, Cartel, supra,* and sections of RE-STATEMENTS OF THE LAW (TORTS AND JUDG-MENTS).[42] We are satisfied that the trial

---

41. *Plath, supra* note 34, 319 N.Y.S.2d 433, 268 N.E.2d at 120. *Plath* involved a settlement between the plaintiff (executor of an estate) and the driver of the car that resulted in the death of the testator; the owner of the car who was potentially liable under a New York statute which was "analogous to that of the master for the negligent acts of his servant under the doctrine of *respondeat superior.*" *Id.* at 119 (citation omitted). The court asserted that: "an aggrieved party should be allowed to settle a portion of his claim with one of the wrongdoers and at the same time expressly reserve his rights as against other wrongdoers." *Id.* at 120. Any "concern over excess or double recovery ... is diminished by reducing the amount of a later recovery, *pro tanto,* by the amount of the consideration received from his prior settlements." *Id.*

42. The judge specifically mentioned COMMENT (d) of § 16 of the RESTATEMENT OF THE LAW (THIRD) TORTS (2000), which states, in pertinent part:

*Vicariously liable parties.* When multiple parties are treated as a single entity for the purpose of assigning responsibility ..., a settlement with one of those parties extin-guishes the liability of the others.... The voluntary dismissal, without prejudice, of one of several parties treated as a single entity ... does not extinguish the liability of all other parties. Similarly, a purely nominal settlement with one such party does not extinguish the liability of all other parties treated as a single entity.

The "Reporters Notes" to § 16, COMMENT (d) purport to explain the comment; and the notes list many cases which have decided both that settlement with the agent releases the vicariously liable principal, and settlement with the agent does not release the vicariously liable principal.

The judge also considered a passage from the "Reporters Notes" to § 50 of the RESTATE-MENT OF THE LAW (SECOND) JUDGMENTS (1982), which referenced *Plath:* "Many jurisdictions appear still to apply the old rule when the discharge is in favor of an active tortfeasor and the other person sought to be held re-sponsible is vicariously liable for the wrong, [citations omitted], although it is difficult to see why such an exception is warranted." And, the judge highlighted COMMENT (f) of § 51 of the RESTATEMENT OF THE LAW (SECOND) JUDG-MENTS, *see* note 39, *supra.*

court correctly concluded that the parties to the settlement agreement did not intend to release WBSI from liability on either the negligence or loss of consortium claim. The specific, carefully crafted, unambiguous and plain wording of the settlement agreement supports this conclusion, as indicated by the following provisions: (1) "the parties ... have reached a partial settlement only, and only as to those claims that are part of [Mrs. Wilson's] Claim against Dr. Barrett"; (2) the parties have "stipulate[d] and agree[d] that th[e] Agreement [was] not a release in any respect of Dr. Barrett's liability ... for [Mr. Wilson's negligence] claim"; (3) Dr. Barrett's waiver of the statute of limitations for 18 months "for damages for [Mr. Wilson's] claim"; (4) the dismissal of Dr. Barrett, "without prejudice"; (5) "[t]he parties have discussed a potential verdict for all claims somewhere between $10,000,000.00 to $20,000,000.00"; (6) the parties' "agree[ment] that [Mrs. Wilson's] Claim for loss of consortium is significant, and could easily be valued at $5,000,000.00 by the jury"; and (7) the total settlement sum was $4,050,000.00.[43] We conclude that the trial court correctly construed the settlement agreement "according to established rules of contract interpretation," looking first to the language used in the settlement agreement to determine whether the words of the agreement released WBSI from liability.[44]

Furthermore, in light of our survey of the law, we are persuaded that the trial court did not err in its legal conclusions concerning the effect of the settlement agreement on the vicarious liability of WBSI for both the negligence and loss of consortium claims.[45] Pertinent excerpts from the trial court's legal ruling follow:

> [A]t least one way of stating the issue presented to me on the motions made by [WBSI], is the question whether the settlement of Mrs. Wilson's loss of consortium claim discharges the obligations of [WBSI] as to both that claim and Mr. Wilson's separate claim where the liability of [WBSI] is *respondeat superior* liability only. I have not found any cases in the District of Columbia that answer that question. . . .

> [T]he common law rule, if one goes back far enough, is that the settlement and release with one of [the] joint tortfeasors discharges all joint tortfeasors. But as the law has developed, . . . many jurisdictions, if not most, have rejected the common law rules that deviate from the old common law rule. . . . [A]n intermediate [c]ourt of [a]ppeals in Maryland to whose law we look for common law in the absence of common law of our own . . . followed the common law rule, that the discharge of the agent operates to discharge the principal.

43. *See Noonan, supra* note 16, 686 A.2d at 241 (where a release "is facially unambiguous, we must rely solely upon its plain language as providing the best objective manifestation of the parties' intent.") (citations and internal quotation marks omitted); *see also Washington Hosp. Ctr., supra,* 722 A.2d at 342 (citation omitted).

44. *See Noonan, supra* note 16, 686 A.2d at 241.

45. We agree with the trial court that the more difficult question is whether the settlement

agreement effectively released WBSI from the loss of consortium claim. Since the parties to the agreement (1) contemplated that the potential value of that claim "could easily be" $5,000,000.00, and (2) released Dr. Barrett, "without prejudice" and (3) given the trend toward extension of the modern joint liability rule to vicarious liability in certain cases, we cannot say that the trial court's legal conclusion concerning the loss of consortium claim and the release under the settlement agreement was improper.

The highest court of Maryland has not adopted that view[,] ... [a]nd I'm reasonably confident that the highest court in this jurisdiction wouldn't follow that rule either....

After discussing the law in detail, as noted earlier, the trial court announced its conclusions, declaring, in part:

So as to the loss of consortium claim itself, there is no clear answer from this jurisdiction. But I would predict enough to be comfortable at this stage of the case holding [WBSI] in [the case] on Mrs. Wilson's loss of consortium claim.... So with respect to that claim, the motion for summary judgment is denied. The easier question, ... for me at least, is the question of Mr. Wilson's claim. As to that claim, ... there is absolutely nothing in the settlement with [ ] Dr. Barrett of the loss of consortium claim that would operate to discharge, release, or in any other way satisfy the liability of [WBSI] if it is found that there was negligence by its agents that resulted in the injury to— that proximately caused the injury to Mr. Wilson, and the principal should therefore be held liable....

[I] don't think under the[ ] circumstances presented here ... our Court of Appeals would hold that an agreement that expressly does not release any claims that Mr. Wilson has against Dr. Barrett, expressly reserves the right to pursue those claims for at least a period of another 18 months, expressly does not discharge or release those claims against Dr. Barrett's employer and expressly reserves the right to pursue those claims against the employer, operates as an adjudication on the merits of Mr. Wilson's claims against the employer, such that it would have *res judicata* effect and bar those claims forever....

There is a strong public policy which permeates all of the law in this area in favor of settlement of disputes. And certainly the law would not want to go in a direction that would discourage parties like Dr. Barrett from settling his part of the dispute with the plaintiff.

Moreover, ... there is a strong public policy in favor of compensating injured victims to the full extent of the law. Whether or not [WBSI] is ultimately found liable to Mr. Wilson, certainly the law promotes and encourages his ability to pursue any remedies he may have to seek compensation for those injuries from parties responsible....

In short, upon review of the settlement agreement, our case law, and relevant case law from other jurisdictions, we agree with the trial court's analysis and conclusions before trial, as well as after trial in disposing of WBSI's motion for judgment as a matter of law, and we hold that under the circumstances of this case, the release of Dr. Barrett (agent) as to Mrs. Wilson's loss of consortium claim did not effect a release of the vicariously liable WBSI (principal) with respect to either the negligence or the loss of consortium claim.

Our holding fits within the confines of our case law which states "that releases are contracts and should be construed according to established rules of contract interpretation" where "the parties' intentions [are] paramount." [46] Moreover, it is consistent with our decision to abandon the common law rule relating to the effect of the release or discharge of a joint tortfeasor; and with the decision of other jurisdictions to abandon the common law rule governing the effect on a vicariously liable principal of the release or discharge of an agent. The concern that a plaintiff will receive double recovery if we abandon the common law rule relating to vicarious lia-

**46.** *Noonan, supra* note 16, 686 A.2d at 241 (citations omitted).

bility is tempered by the specific circumstances of this case and by the fact that WBSI, the vicariously liable principal, could and did obtain a *pro tanto* credit for the amount paid by Dr. Barrett, its employee, in his settlement with Mrs. Wilson. Moreover, if we were to hold that the release of Dr. Barrett effectively released WBSI as to all claims, including Mr. Wilson's negligence claim, Mrs. Wilson would receive less than full satisfaction for the catastrophic injuries suffered by Mr. Wilson.

Arguably, as WBSI suggests, adopting the modern rule could undermine "our longstanding policy of encouraging settlements"[47] because the servant might be less inclined to settle if the employer decided to seek indemnification against him. Such a result is uncertain for "indemnity is almost never sought against negligent servants."[48] In the event that the employer does seek indemnity, the employee may still be willing to settle to reduce the transactional costs of remaining in the lawsuit, i.e., attorneys fees and time spent attending court proceedings. Furthermore, we are unpersuaded by WBSI's argument that because "the statute of limitations had run, that act alone, in law, branded the dismissal as a dismissal with prejudice against WBSI," and "Dr. Bar-

rett had no authority to waive ... any of WBSI's defenses...." WBSI loses sight of the fact that the Wilsons filed their action against WBSI on May 16, 2003, years before the April 25, 2006 settlement agreement between Mrs. Wilson and Dr. Barrett, and before the expiration of the statute of limitations. Dr. Barrett's waiver of the statute of limitations to permit the Wilsons to refile their action against him within eighteen months after the settlement agreement, did not disturb the Wilsons' ongoing claims against WBSI, and certainly did not operate as "a determination of liability."[49]

### The Negligence Issue

We next turn to Dr. Convit's argument that the trial court erred in denying his motion for judgment on Mr. Wilson's negligence claim. Specifically, Dr. Convit argues that the trial court erred in denying his motion for judgment because the Wilsons failed to present evidence that an act or omission by him "violated any standard of care or proximately caused Mr. Wilson's injuries."[50] In addition, Dr. Convit contends that even if reasonable jurors could conclude that negligence occurred, "judgment against [him] should be reversed because Dr. Barrett's failure to remove the shunt when Mr. Wilson was hospitalized the day after Dr. Convit's surgery consti-

---

**47.** *Paul v. Bier,* 758 A.2d 40, 48 (D.C.2000) (citations omitted).

**48.** 2 Dan B. Dobbs, *The Law of Torts* § 333 (2001).

**49.** The Supreme Court of Arizona rejected a similar argument, holding that the principal was not "relieved of potential liability by the dismissal of the case as to [the agent] nor by the covenant not to sue....":

> [The principal] argues that because ... the dismissal without prejudice occurred after the statute of limitations on personal injury actions had run and an action against the agent could no longer be brought, the dismissal was, in effect, a dismissal with preju-

dice. We disagree. A statute of limitations is not a determination of liability; it merely prevents the bringing of an action when pled as an affirmative defense.

*Hovatter v. Shell Oil Co.,* 111 Ariz. 325, 529 P.2d 224, 225–26 (1974).

**50.** Dr. Convit also argues that the trial court erred "because the verdict form it used rendered it impossible to determine which standard of care Dr. Convit allegedly breached and which alleged breach proximately caused the Wilsons' injuries." As we discuss *infra,* the Wilsons presented only one theory of Dr. Convit's liability; that he deviated from the standard of care by covering Mr. Wilson's exposed shunt.

tuted a superseding cause that relieved Dr. Convit of any liability."

### Standard of Care

■ It is well established that " '[t]he plaintiff in a negligence action bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.' "[51] "With respect to the first requirement . . . '[a] plaintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.' "[52] In *Hawes v. Chua*, 769 A.2d 797 (D.C.2001), based on our prior case law, we summarized "seven legal principles . . . important in assessing the sufficiency of national standard of care proof."[53]

> First, the standard of care focuses on the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances. Second, the course of action or treatment must be followed nationally. Third, the fact that District physicians follow a national standard of care is insufficient in and of itself to establish a national standard of care. Fourth, in demonstrating that a particular course of action or treat-ment is followed nationally, reference to a published standard is not required, but can be important. Fifth, discussion of the course of action or treatment with doctors outside this jurisdiction, at seminars or conventions, who agree with it; or reference to specific medical literature may be sufficient. Sixth, an expert's personal opinion does not constitute a statement of the national standard of care; thus a statement only of what the expert would do under similar circumstances is inadequate. Seventh, national standard of care testimony may not be based upon mere speculation or conjecture.[54]

In addition, we have said that "an expert's educational and professional background is not sufficient to demonstrate that he is familiar with the national standard of care."[55] Thus, "[w]here the expert makes 'no attempt to link his testimony to any certification process, current literature, conference or discussion with other knowledgeable professionals,' there is no 'basis for his discussion of the national standard of care.' "[56] "Our primary concern is whether it is reasonable to infer from [the] testimony that such a standard is nationally recognized."[57] "[A] decision that the expert testimony presented by the plaintiff was (or was not) sufficient to meet her burden of proof is a question ultimately of law that we decide *de novo*."[58]

**51.** *Hill v. Metropolitan African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001) (quoting *Levy v. Schnabel Found. Co.*, 584 A.2d 1251, 1255 (D.C.1991)).

**52.** *Hill, supra* note 51, 779 A.2d at 908 (quoting *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C.2000)).

**53.** *Hawes, supra*, 769 A.2d at 806.

**54.** *Id.* (internal citations and quotation marks omitted).

**55.** *Coulter v. Gerald Family Care, P.C.*, 964 A.2d 170, 189 (D.C.2009) (citing *Strickland v. Pinder*, 899 A.2d 770, 774 (D.C.2006); *Nwaneri v. Sandidge*, 931 A.2d 466, 467 (D.C. 2007)).

**56.** *Coulter, supra* note 55, 964 A.2d at 189 (quoting *Strickland, supra* note 55, 899 A.2d at 774).

**57.** *Snyder v. George Washington Univ.*, 890 A.2d 237, 245 (D.C.2006) (citation and internal quotation marks omitted).

**58.** *Hawes, supra*, 769 A.2d at 806.

■ Upon review of the record, we cannot agree with Dr. Convit that Mrs. Wilson presented insufficient evidence to establish that Dr. Convit deviated from the national standard of care by performing the flap procedure on Mr. Wilson. She presented two experts who testified about the national standard of care—plastic and reconstructive surgery expert Dr. Breitbart, and infectious disease expert Dr. Clayton Moravec. Dr. Breitbart testified that Dr. Convit deviated from the national standard of care. The national standard of care required Dr. Convit to remove the shunt before he closed the wound because the shunt had been exposed to air and contaminated, and since he negligently failed to remove the shunt, he was obliged to inform Dr. Barrett that the shunt had been exposed to air but had not been removed. Dr. Breitbart testified that the national standard of care required Dr. Convit to recognize that the shunt was contaminated and had to be removed unless Dr. Barrett determined that neurological circumstances in this case required that it remain in place.[59] Dr. Moravec concurred, stating that Dr. Convit breached the standard of care by flapping the VP shunt, whether the device was infected or contaminated. He explained, "I don't know of an infectious disease doctor that wouldn't recommend a shunt that is exposed to the air . . . come out."

Dr. Breitbart testified about his private general surgery practice; board certification in the fields of general surgery and plastic and reconstructive surgery; membership in national organizations such as the American Society of Plastic Surgeons and American Society of Maxillofacial Surgeons; attendance at nationwide conferences of plastic surgeons where he talks about how plastic surgery is performed in different states; forty or fifty publications, including book chapters and articles in plastic surgery journals and a chapter on implant materials in one of the primary plastic surgery textbooks; and how he regularly keeps up with the literature in the field of plastic and reconstructive surgery. When asked "whether [Dr.] Convit's actions [on May 18th] . . . deviated from, the standard of care of a reasonably prudent plastic surgeon on a national standard of care basis" Dr. Breitbart unequivocally responded "Yes, that was a deviation from the standard of care." Dr. Breitbart did not "state[ ] only what he would do under similar circumstances"[60] or that his testimony was based on conversation he had with "local fellow surgeons."[61] The fact that Dr. Breitbart has not been involved in the specific procedure of covering flaps does not make his testimony on the standard of care insufficient.[62] As Dr. Convit's plastic and reconstructive surgery expert, Michael Olding, testified, "[i]n terms of the principles that one applies to treat an ex-

---

**59.** Dr. Donlin Long, the neurosurgeon for the defense, also recognized that the best course of action was to remove the shunt, and that in keeping with the national standard of care, Dr. Barrett should have advised Mr. Wilson that the shunt had to be removed. In addition, given the exposure of the shunt to the air, Dr. Peerless and other experts recognized that contamination was immediate and the longer the exposure the higher the risk of infection.

**60.** *See Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984) (testimony about what doctor

would do in similar circumstances insufficient to establish national standard of care).

**61.** *See Travers v. District of Columbia,* 672 A.2d 566, 569 (D.C.1996) (testimony about other local surgeons' practices insufficient to establish national standard of care).

**62.** *See Kane v. Ryan,* 596 A.2d 562, 566 (D.C. 1991) (" '[a] physician is not incompetent to testify as an expert merely because he [or she] is not a specialist in the particular field of which he [or she] speaks' " (quoting *Baerman v. Reisinger,* 124 U.S.App. D.C. 180, 181, 363 F.2d 309, 310 (1966))).

posed foreign body of any type, the principles are the same." Dr. Convit agreed. Similarly, our case law does not require Dr. Breitbart to reference the specific source from which he obtained the national standard of care.[63]

Likewise, Dr. Convit's claim that Dr. Moravec failed to establish that he deviated from the national standard of care because "there is no evidence upon which a reasonable jury could conclude that the shunt which Dr. Convit covered was infected or that Mr. Wilson had any infection at that time" is misplaced. Dr. Moravec testified that Dr. Convit deviated from the standard of care even if at the time he performed the flap procedure Mr. Wilson's exposed shunt was only contaminated. Dr. Peerless, Dr. Moravec, and Dr. Williams all testified, that at the time Dr. Convit performed the flap procedure, the area around Mr. Wilson's shunt was at least contaminated with bacteria or fungi.[64] In sum, Mrs. Wilson introduced sufficient evidence to demonstrate that Dr. Convit breached a national standard of care.

### Causation

Dr. Convit also contends that he was not the proximate cause of Mr. Wilson's neuro-logical injuries, and that Dr. Barrett's failure to remove Mr. Wilson's right shunt when Mr. Wilson was hospitalized on May 19 was a superseding cause that relieved Dr. Convit of liability.[65] Mrs. Wilson maintains that "[Dr.] Convit's superseding cause defense ... failed because the jury understood that [Dr.] Barrett's failure to remove the shunt on May 19 was reasonably forseeable to [Dr.] Convit, and not the type of unforseeable, 'highly extraordinary' event that constitutes a superseding cause as a matter of law"; and that "the evidence showed that by the time [Dr.] Barrett saw Mr. Wilson on May 19, it was too late to prevent the permanent injuries caused by [Dr.] Convit."

■ "To establish proximate cause, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable." [66] Moreover, "[p]roximate cause has been defined as 'that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.' " [67] "Superseding cause is a subset

---

**63.** *See Hawes, supra,* 769 A.2d at 806.

**64.** Dr. Moravec's testimony that Dr. Convit deviated from the standard of care if he covered a wound possibly contaminated due to exposure to air, makes *Street v. Hedgepath,* 607 A.2d 1238 (D.C.1992) inapposite. In *Street* this court upheld the exclusion of an expert's testimony on the standard of care because the expert based his opinion on pictures taken by the treating doctor and conceded that he had no experience in diagnosing thyroid cancer by looking at a photograph or that such a determination was generally accepted in the particular field in which he belongs. *Id.* at 1244. Dr. Moravec based his testimony on a fact undisputed and corroborated by the medical records at trial, that Mr. Wilson's wound had been exposed to the air.

**65.** During his closing argument, counsel for Dr. Convit stated, in part:

In considering the issue of causation, whether or not alleged actions of Dr. Convit proximately caused or was a significant factor in causing the ultimate meningitis and the injury to Mr. Wilson, that if ... the shunt [had been removed] on the 19th, then his condition would be better .... [—] you have to consider whether or not the alleged actions of Doctor Barrett in not removing the shunt absolved Doctor Convit of any responsibility for his current condition.

**66.** *District of Columbia v. Zukerberg,* 880 A.2d 276, 281 (D.C.2005) (citations and internal quotation marks omitted).

**67.** *McKethean v. WMATA,* 588 A.2d 708, 716 (D.C.1991) (citations and internal quotation

of the inquiry into proximate cause." [68] "In essence, it is a concept that the action of a subsequent tortfeasor may be a 'superseding cause' which breaks the chain of causation and relieves the first tortfeasor of liability to the injured party." [69] Furthermore, "proximate cause ... is ordinarily a question of fact for the jury[; and] [i]t is only in cases where it is clear that reasonable [people] could draw but one conclusion from the facts alleged that negligence and proximate cause become questions of law. These cases have been said to be exceptional." [70]

■ The record reflects that the evidence adduced at trial supported a finding that Dr. Convit's acts during his surgery constituted a proximate cause of Mr. Wilson's injury, and that the failure of Dr. Barrett to remove the right shunt on May 19 was not a superseding cause of Mr. Wilson's injuries.[71] The undisputed evidence at trial established that the exposed wound over Mr. Wilson's right shunt was contaminated on May 18 when Dr. Convit performed the flap procedure. According to Dr. Peerless, Dr. Convit's flap proce-

dure "broke down the local barriers that the body had built up ... and precipitated the spread of ... both bacteria and fungi from the scalp and the tissues on the scalp into the brain and onto the surface of the brain." Dr. Williams further explained:

The purpose of the skin, in this case the scalp, is to protect the body from things on the outside and to keep normal things on the inside. And one of the ways that an infection can occur is if that physical barrier ... is disrupted.... And if this is disrupted, then those bacteria come onto the surface of whatever is down there. In this case the shunt....

.... [T]he procedure to cover the shunt involved moving some of the skin ... over it.... And for whatever extent that the body is holding back this infection, that's been altered by the surgery.

Dr. Williams stated that as a result of the surgery, "the bacteria and everything that was on the surface ... continue[d] to spread along the shunt and eventually down the catheter." The bacteria then spread past the dura, into the subarachnoid space and then finally reached the

---

marks omitted); *see also Zukerberg, supra* note 67, 880 A.2d at 281.

**68.** *National Health Labs., Inc., v. Ahmadi,* 596 A.2d 555, 560 (D.C.1991)

**69.** *Id.* at 560 (citing *McKethean, supra* note 67, 588 A.2d at 716 n. 9; RESTATEMENT (SECOND) OF TORTS § 440 (1965) (footnote omitted)); *see also Sanders v. Wright,* 642 A.2d 847, 849 (D.C.1994) (quoting § 440 of the RESTATEMENT (SECOND) OF TORTS: " 'A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.' ").

**70.** *National Health Labs., Inc., supra* note 68, 596 A.2d at 560 (citation and internal quotation mark omitted).

**71.** The trial court's superseding cause instruction was tailored to the case, and read:

If you find that one defendant was negligent and set in motion a chain of events, but that the subsequent negligent act or omission of the other defendant is what caused the plaintiffs' injuries, then the negligence of the first actor is not the proximate cause of the injury unless the first actor could have reasonably foreseen the subsequent negligent acts and protected against them.

If under the circumstances a reasonably prudent doctor should have reasonably foreseen the other doctor's subsequent acts or omissions and protected against them, then the first doctor to act may be liable for the plaintiffs' injuries.

If however a reasonably prudent doctor could not have foreseen the other doctor's subsequent acts or omissions and protected against them, then the first doctor is not liable for the plaintiffs' injuries.

surface of the brain. Dr. Williams testified that samples of spinal fluid taken from the left shunt did not show signs of infection because "[a]ll the infection [was] out ... in the subarachnoid spinal fluid." The fluid that was in the obstructed catheter was "stagnant" because the "shunt [was] blocked." Therefore, none of the taps on the left were ever getting a sample of fluid from the right shunt. Dr. Williams and Dr. Peerless both concluded that Dr. Convit most likely manipulated Mr. Wilson's shunt when he performed the flap procedure which caused the obstruction in the catheter.

Notably, Dr. Convit did not present an expert to establish that the failure of Dr. Barrett to remove the right shunt broke the sequence of Dr. Convit's negligence and produced Mr. Wilson's injuries. Rather, he depends upon the testimony of the Wilsons' experts, especially Dr. Peerless and Dr. Moravec, in constructing his superseding cause argument.

Upon review of the record, we see no reason to disturb the jury's decision that "plaintiffs prove[d] by a preponderance of the evidence that Dr. Convit's violation of the national standard of care was a proximate cause of Mr. Wilson's injuries and damages." As we have said, "proximate cause ... is ordinarily a question of fact for the jury," and "[s]uperseding cause is a subset of the inquiry into proximate cause." [72] Moreover, we cannot say that this case is one of those "exceptional" cases "where it is clear that reasonable [people] could draw but one conclusion from the facts alleged" concerning the proximate or alleged superseding cause of Mr. Wilson's injuries. Hence, we cannot say as a matter of law that Dr. Convit could not have foreseen that Dr. Barrett would not remove the right shunt on May 19, nor can we state that Dr. Barrett's negligent failure to discover and remove Mr. Wilson's infected right shunt on May 19 was a superseding cause of Mr. Wilson's injuries and that, consequently, Dr. Convit's negligence was not a proximate cause of those injuries. In short, given the evidence presented to the jury, we are satisfied that a reasonable jury could conclude that Dr. Convit's flap procedure was a proximate cause of Mr. Wilson's neurological injuries.[73]

### The Judgment Credit Issue

Finally, all parties contend that the trial court erred in calculating the judgment credit to which they are entitled. Both

**72.** *National Health Labs., Inc., supra* note 68, 596 A.2d at 560.

**73.** Dr. Convit relies on *Siggers v. Barlow*, 906 F.2d 241 (6th Cir.1990), in support of his superseding cause argument, but that case, involving the failure of a second emergency room doctor to contact a patient with an injured wrist where the first emergency room physician misread an x-ray and failed to treat a fracture, is quite different from this one, as revealed in *Looney v. Davis*, 721 So.2d 152, 160–61 (Ala.1998). After distinguishing *Siggers*, in which the court concluded that the second emergency room physician's failure to contact the patient was a superseding act that relieved the first doctor of liability, the court stated: "Even if we agreed that *Siggers v. Barlow* was correctly decided—and we think that point is questionable—this present case is distinguishable from it and is governed by the general rule that subsequent negligent medical care is foreseeable and therefore is not regarded as a superseding cause of injury." *Id.* at 161 (citation omitted). Dr. Convit also leans on *Sanders, supra* note 69, but that case is vastly different from the instant case. *Sanders* involved an initial collision of one car with another in bad weather. The appellant, a passenger in the automobile that was hit, emerged from the vehicle and was standing on the side of the road when, five to ten minutes later, a different vehicle that was traveling at a high rate of speed struck and seriously injured plaintiff. Under those different circumstances, we determined that the negligence of the third party represented a superseding cause of the harm to appellant. 642 A.2d at 848, 851.

WBSI and Dr. Convit essentially argue that due to the settlement agreement between Dr. Barrett and Mrs. Wilson, they are entitled to a 50% *pro rata* credit and reduction of the total jury verdict on both the negligence and loss of consortium claims.[74] Mrs. Wilson asserts that the trial court erred by "reduc[ing] the jury's verdict for Mr. Wilson against WBSI on Count I [the negligence claim], based on Mrs. Wilson's settlement with [Dr.] Barrett on Court II [the consortium claim]." She also contends that the trial court erred by giving "WBSI a *pro tanto* credit" and Dr. Convit "a 50% *pro rata* credit" on Count II, and that Dr. Barrett's "settlement with Mrs. Wilson entitled WBSI and [Dr.] Convit to only a 33% *pro rata* credit against the verdict on Count II."

▆▆▆▆▆ Where the plaintiff settles with a joint tortfeasor, the non-settling tortfeasors are entitled to a credit. "The question of how to credit the judgment entered upon a jury verdict against a nonsettling defendant with the proceeds a settling defendant paid to the plaintiff is purely a question of law, which this court reviews *de novo*."[75]

In *District of Columbia v. Shannon*, 696 A.2d 1359 (D.C.1997), we recounted the origin of the judgment credit concept in this jurisdiction:

> In *Martello v. Hawley*, 112 U.S.App. D.C. 129, 300 F.2d 721 (1962), the United States Court of Appeals for the District of Columbia Circuit held, in an opinion binding on us, that where a plaintiff settles with one joint tortfeasor whose liability is judicially established, a nonsettling tortfeasor is entitled to a pro rata reduction of a jury verdict for the plaintiff. *See id.* at 132, 300 F.2d at 724. The court reasoned that, because the remaining defendants could have sought contribution from the settling defendant had the settlor remained in the case, no remaining defendant should be forced to pay more than it otherwise would have paid if the settling defendant had not settled. *See id.* at 131, 300 F.2d at 723.[76]

In *Washington Hosp. Ctr., supra,* we summarized the judgment credit concept as it has developed in this jurisdiction:

> In this jurisdiction, where there is contribution among joint tortfeasors, damages are apportioned equally among them. *R. & G. Orthopedic Appliances [v. Curtin* ], [ ] 596 A.2d [530,] 544 [ (D.C.1991)] (citing *Early Settlers [Ins. Co. v. Schweid* ], [221 A.2d 920,] 923 [D.C.1966] ). When one party settles with the injured party, and the claim proceeds to verdict against the non-settling party, "where contribution would otherwise be called for, a credit is applied against the amount of any judgment ... equal to the share of the judgment that should be borne by the settling tortfeasor." *Lamphier, supra* [note 18], 524 A.2d at 733. If the settling tortfeasor is judicially determined to be a joint tortfeasor, the non-settling defendant is entitled to a *pro rata* credit against the verdict. *Berg, supra* [note 11], 673 A.2d at 1248 (citing *Martello, supra,* 112 U.S.App. D.C. at 132, 300 F.2d at 724). "When plaintiff has

---

**74.** Alternatively, WBSI argues that "if the unity of master and servant is ignored," the jury verdict should be reduced by one-third because "there are three adjudicated tortfeasors ... Dr. Barrett, WBSI, and Dr. Convit." We reject this argument because as we explain, *infra*, there are only two tortfeasors, Dr. Barrett and Dr. Convit.

**75.** *Paul, supra* note 47, 758 A.2d at 42 (citations and internal quotation marks omitted).

**76.** *Shannon, supra,* 696 A.2d at 1366 (footnote omitted).

settled with a party whose culpability has not been determined, or with a party whom the finder of fact has found not liable, the court awards the nonsettling defendant a credit against the verdict in the amount of the settlement," dollar-for-dollar (*pro tanto*), 673 A.2d at 1248–49 (citing *Snowden v. District of Columbia Transit Sys., Inc.*, 147 U.S.App. D.C. 204, 205–06, 454 F.2d 1047, 1048–49 (1971)). In either case, the risk of loss is on the injured party who has sold a portion of his or her claim.[77]

■■■■ Thus, as we have said, a *Martello* (*pro rata*) credit is warranted when two requirements are met: (1) the nonsettling defendant asserts "the settling defendants' negligence and [his] right to contribution *before* the jury returns a verdict"; and (2) the settling defendant is found jointly liable for the harm caused to the plaintiff.[78] The purpose behind this policy is to prevent a settlement from defeating "the non-settling joint tortfeasor's right to recover a full measure of contribution which otherwise would not be vindicated without undermining the policy of according protective finality to out-of-court settlements by tort-feasors."[79] Conversely, if "the plaintiff has settled with a party whose culpability has not been determined or with a party whom the finder of fact has found not liable, the court awards the nonsettling defendant a credit against the verdict in the amount of the settlement, dollar-for-dollar (*pro tanto*)."[80] "The rationale behind the *pro tanto* credit ... is to ensure that the plaintiff receives no more than the loss actually suffered for her claim."[81]

We have not previously had a case requiring the calculation of a judgment credit where an agent entered into a settlement agreement with a plaintiff but the vicariously liable employer did not, and where the jury returned a verdict against the vicariously liable employer, as well as another party. Here, when the Wilsons filed their complaint, there were two potential joint tortfeasors, (1) Dr. Barrett/WBSI under a theory of *respondeat superior* and (2) Dr. Convit.[82] Both WBSI and Dr. Convit declined to settle, leaving WBSI and Dr. Convit as potential joint tortfeasors. Furthermore, we have already concluded that the settlement agreement between Dr. Barrett and Mrs. Wilson, and the $4,050,000.00 settlement sum applied only to the loss of consortium claim.

---

**77.** *Washington Hosp. Ctr., supra,* 722 A.2d at 339 n. 8.

**78.** *Washington v. Washington Hosp. Ctr.,* 579 A.2d 177, 187–88 (D.C.1990).

**79.** *Id.* at 186 (citation and internal quotation marks omitted).

**80.** *Berg, supra* note 11, 673 A.2d at 1248–49 (citing *Snowden v. District of Columbia Transit Sys., Inc.,* 147 U.S.App. D.C. 204, 205–06, 454 F.2d 1047, 1048–49 (1971)). The RESTATEMENT (SECOND) OF JUDGMENTS § 51 provides a useful illustration of *pro tanto* credit in the vicarious liability context:

10. P is injured as the result of being struck by a car owned by O and driven with O's permission by D. P brings an action against D, which results in a verdict for D. Within the time allowed in which P may appeal, P and D conclude an agreement by which judgment for $1,000 is entered for P, and payment of that amount is made by D. The judgment does not preclude P from bringing an action against O but any liability that may be established against O is discharged to the extent of $1,000.

**81.** *Washington, supra* note 78, 579 A.2d at 190.

**82.** *See Chidel v. Hubbard,* 840 A.2d 689, 698 (D.C.2004) (physician employee (here Dr. Barrett) and vicariously liable medical employer (here WBSI) "treated as one tortfeasor").

The trial court ruled, and we agree, that WBSI could not be held liable to pay a compensatory-damages amount already satisfied by its agent, Dr. Barrett (who has never been judicially determined to be a tortfeasor), on the loss of consortium claim.[83] Thus, the trial court correctly applied a *pro tanto* credit of $4,050,000.00 to the $2,500,000.00 judgment against WBSI on the loss of consortium claim. The settlement agreement, then, effectively relieved WBSI of all obligation to pay the damages award applicable to the loss of consortium claim. The trial court also correctly decided that Dr. Convit, as an adjudicated joint tortfeasor, was liable for only 50% of Mrs. Wilson's loss of consortium judgment; hence, he was entitled to a $1,250,000.00 *pro rata* reduction of the jury award for Mrs. Wilson's claim.

■■■ Mrs. Wilson's argument that the trial court erred by giving WBSI a *pro tanto* credit and Dr. Convit a 50% *pro rata* credit, rather than a 33% *pro rata* credit each to WBSI and Dr. Convit, is incorrect. Similar to this court in *Chidel, supra* note 82, in *St. Paul Fire & Marine Ins. Co. v. MAG Mutual Ins. Co.,* 209 Ga.App. 184, 433 S.E.2d 112 (1993), the trial court declared that contribution shares of the parties should be one-half for one joint tortfeasor (Piedmont Hospital Inc.) and a combined one-half for the other joint tortfeasor (Dr. John C. Garrett) and his derivatively liable employer (Resurgens, P.C.). On appeal, the insurance carrier of Piedmont Hospital Inc. argued, as Mrs. Wilson does here, "that the correct measure of contribution among joint tortfeasors should be determined by dividing the judgment or settlement amount by the number of joint tortfeasors without regard to the character of each tortfeasor's negligence and that, therefore, in this case each defendant should pay one-third of the total amount paid in settlement to the plaintiff." [84] The Court of Appeals of Georgia, however, agreed with the trial court, explaining that "[w]here one or more of such defendants is liable solely on the basis of negligence imputed to him by virtue of his relationship with one of the other tortfeasors, the one guilty of negligence and the one to whom that negligence is imputed are to be treated as one party for the purpose of measuring the pro rata share of contribution due to the others." [85] In sum, we agree with the trial court's calculation of the judgment credits with respect to the loss of consortium claim.

■■■ We also reject WBSI's and Dr. Convit's argument that they are each entitled to a 50% *pro rata* reduction on Mr. Wilson's negligence claim. As we previously noted, a 50% *pro rata* reduction is warranted only when a joint tortfeasor settles his claim with the plaintiff.[86] The settlement agreement, which was between Mrs. Wilson and Dr. Barrett only, does not, as the trial court ascertained, manifest Mrs. Wilson's intent to settle the negligence claim (and, of course, could not signify WBSI's intent to settle). The settlement agreement explicitly states "this Agreement in no way releases the defen-

---

**83.** *See In re Underwood, supra* note 15, 665 A.2d at 648 n. 41. Mrs. Wilson argues that "[n]o one disputed that Barrett, WBSI and Convit were joint tortfeasors, and that is what the jury found." But, in her Points and Authorities to her Consent Motion to Approve Settlement of One Claim Only Under SCR Civ. P. 17(c), she conceded that "WBSI's liability is based on its vicarious liability for Dr. Barrett only...." The jury verdict also only reflects that the jury found WBSI liable for Dr. Barrett's actions, not as a separate, independent joint tortfeasor.

**84.** *St. Paul Fire & Marine Ins. Co., supra,* 433 S.E.2d at 113.

**85.** *Id.* at 114.

**86.** *Washington, supra* note 78, 579 A.2d at 187–88.

dant [WBSI] from any part of [Mr. Wilson's] Claims against WBSI for Barrett's actions...." That Mrs. Wilson settled her loss of consortium claim is of no moment. "A loss of consortium claim stands 'separate and independent' from a negligence claim and a 'judgment against [a spouse claiming negligence] is not a bar to an action by [the spouse claiming loss of consortium].' " [87] Furthermore, because the loss of consortium claim, the only claim to which the settlement agreement applies, is independent of the negligence claim, we conclude that the trial court erred in applying the $1.55 million excess sum paid by Dr. Barrett to WBSI's liability on the negligence claim. As we have said previously: "It seems to us that a plaintiff's good fortune in striking a favorable bargain with one defendant gives other defendants no claim to pay less than their ... share of the total loss." [88]

Accordingly, for the foregoing reasons, we reverse the trial court's reduction of WBSI's liability for the award of damages on Mr. Wilson's negligence claim, but we affirm its judgment in all other respects.

*So ordered.*

---

87. *Massengale v. Pitts*, 737 A.2d 1029, 1032 (D.C.1999) (quoting *Lansburgh & Bro., Inc. v. Clark*, 75 U.S.App. D.C. 339, 341, 127 F.2d 331, 333 (1942)) (other citations omitted) (alteration in the original).

88. *Berg, supra* note 11, 673 A.2d at 1256 (quoting *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994)); *see also Schoonover v. Chavous*, 974 A.2d 876, 884 (D.C.2009) ("It is unusual for plaintiffs to recover more than the full

amount awarded by the jury. Nevertheless, we have approved that outcome ....") (footnote omitted which cited and discussed *Berg, supra* note 11, and *Chidel, supra* note 82, 840 A.2d at 699 n. 11). Other claims remain to be resolved in this case. The trial court noted that its order pertaining to the calculation of judgment credits "does not purport to adjudicate any of the pending cross-claims filed by the parties, including those filed against Dr. Barrett."